## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JONATHAN ZOU, OLIVER KOZLER, ALICE ELLIOTT, CHRISTIAN GRANT, and GABRIEL VIEIRA,

      Plaintiffs,

 v.

SANTA J. ONO, in his official capacity as President of the University of Michigan; GEOFFREY CHATAS, in his official capacity as Executive Vice President and Chief Financial Officer of the University of Michigan; EDDIE L. WASHINGTON, in his official capacity as Executive Director of the University of Michigan's Division of Public Safety & Security; and CRYSTAL JAMES, in her official capacity as Chief of Police for the University of Michigan Police Department,

      Defendants.

Case No. 2:25-cv-10315

Hon.

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Jonathan Zou, Alice Elliott, Christian Grant, and Gabriel Vieira, by and through the undersigned counsel, hereby submit this motion for preliminary injunction pursuant to Fed. R. Civ. P. 65.[1] For the reasons set forth in the accompanying brief, Plaintiffs respectfully seek a preliminary injunction, based on

---

[1] This motion is brought on behalf of all Plaintiffs except Oliver Kozler.

Counts I – IV of their Verified Complaint, prohibiting Defendants from:

(1) enforcing, authorizing others to enforce, or otherwise carrying out the trespass bans issued to Plaintiffs; and

(2) issuing or authorizing others to issue any future trespass bans that cover the entire campus or significant portions of it unless (1) they are issued in response to conduct that poses a convincing, demonstrable, and significant threat of imminent and recurrent physical harm if a ban is not imposed; and (2) Defendants provide the accused with a hearing *before* the trespass ban goes into effect at which all evidence and allegations supporting the ban must be provided to the accused and the determination of whether the ban should be implemented is made by a neutral adjudicator who has not communicated with the accusing police officers on an *ex parte* basis in advance.

Because this motion is being filed contemporaneously with the complaint, there is not yet an attorney of record for Defendants in this case. As a result, Plaintiffs have not been able to obtain concurrence for the relief sought in this motion pursuant to Local Rule 7.1(a).

Respectfully submitted,

/s/ Ramis J. Wadood
Ramis J. Wadood (P85791)          Amanda M. Ghannam (P83065)
Philip E. Mayor (P81691)          Jack W. Schulz (P78078)
Bonsitu Kitaba-Gaviglio (P78822)  Cooperating Attorneys,
Delaney Barker (P87401)           American Civil Liberties Union
Daniel S. Korobkin (P72842)          Fund of Michigan

American Civil Liberties Union
   Fund of Michigan
2966 Woodward Avenue
Detroit, MI  48201
(313) 578-6800
rwadood@aclumich.org

645 Griswold St. Suite 4100
Detroit, MI 48226
(313) 788-7446
amanda@michiganworkerlaw.com
jack@michiganworkerlaw.com


John C. Philo (P52721)
Liz Jacob (P86981)
Anthony D. Paris (P71525)
SUGAR LAW CENTER
FOR ECONOMIC & SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, MI 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
ljacob@sugarlaw.org
tparis@sugarlaw.org

Attorneys for Plaintiffs

Dated: February 3, 2025

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JONATHAN ZOU, OLIVER KOZLER, ALICE ELLIOTT, GABRIEL VIERIA, and CHRISTIAN GRANT,

      Plaintiffs,

 v.

SANTA J. ONO, in his official capacity as President of the University of Michigan; GEOFFREY CHATAS, in his official capacity as Executive Vice President and Chief Financial Officer of the University of Michigan; EDDIE L. WASHINGTON, in his official capacity as Executive Director of the University of Michigan's Division of Public Safety and Security; and CRYSTAL JAMES, in her official capacity as Chief of Police for the University of Michigan Police Department,

      Defendants.

Case No.

Hon.

## BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORTIES .................................................................. ii

ISSUES PRESENTED.................................................................... iv

CONTROLLING AUTHORITY ............................................................v

INTRODUCTION ...........................................................................1

BACKGROUND AND FACTS ...........................................................2

   I.   The University of Michigan's General Use of Trespass Bans .....................2

   II.  The Trespass Bans Issued to Plaintiffs and Their Ongoing Impact .............4

ARGUMENT ...................................................................................8

   I.   Plaintiffs Are Likely to Succeed on the Merits. ...........................................8

      A.  Plaintiffs are likely to succeed on the merits of their First Amendment claim. ...................................................................8

      B.  Plaintiffs are likely to succeed on the merits of their substantive due process claim. ..............................................................14

         i.   Defendants are violating Plaintiffs' fundamental right to freely move about their local community. .......................................15

         ii.  Defendants are violating Plaintiffs' fundamental right to remain in a public place. ...............................................................17

         iii.  The trespass bans cannot survive strict scrutiny. ...........................19

      C.  Plaintiffs are likely to succeed on the merits of their two procedural due process claims..............................................................20

         i.   The lack of pre-deprivation hearings violates procedural due process standards.......................................................20

         ii.  The minimal procedures in the post-deprivation hearings do not satisfy due process.................................................23

   II.  Plaintiffs Will Suffer Irreparable Injury Absent a Preliminary Injunction. .................................................................................24

   III. Issuing a Preliminary Injunction Will Not Substantially Harm Others. .....25

   IV. The Public Interest Will Be Served by a Preliminary Injunction................25

CONCLUSION ...............................................................................25

# TABLE OF AUTHORTIES

## Cases

*ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636 (6th Cir. 2015)...............22

*ACLU of Ky. v. McCreary Cnty.*, *Ky.*, 354 F.3d 438 (6th Cir. 2003), *aff'd*, 545 U.S. 844 (2005)...................................................................................................24

*Bambach v. Moegle*, 92 F.4th 615 (6th Cir. 2024) ........................................... 14, 19

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).............................9

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ............................................. 17, 18

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)...................................21

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)..............................24

*Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536 (D. Vt. 2014) .....11

*Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377 (6th Cir. 2001) ..........................................................................................................................25

*Dep't of State v. Munoz*, 602 U.S. 899 (2024)................................................... 14, 19

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ..............................18

*Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017)......................................23

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ................................................................20

*Gilbert v. Homar*, 520 U.S. 924 (1997) ..................................................................21

*Healy v. James*, 408 U.S. 169 (1972) ........................................................................1

*Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556 (6th Cir. 2011) ......................24

*Hicks v. Crowley*, 2023 WL 348229 (S.D. Ohio 2023)...........................................11

*Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2005) ................................................10

*Johnson v. Bayens*, 2020 WL 12618873 (S.D. Iowa 2020)....................................11

*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002) .................... 15, 16, 20

*Johnson v. Morales*, 946 F.3d 911 (6th Cir. 2020)........................................... 22, 23

*Kennedy v. City of Cincinnati*, 595 F.3d 327 (6th Cir. 2010)................................17

*Kent v. Dulles*, 357 U.S. 116 (1958) ................................................................. 15, 18

*Lichtenstein v. Hargett*, 83 F.4th 575 (6th Cir. 2023) ........................................ 9, 11

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994)............... 10, 11, 12, 14

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ...................................................... 22, 23

*Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548 (6th Cir. 2021) .............8

*Meyer v. Grant*, 486 U.S. 414 (1988) ................................................. 9, 11

*Miller v. City of Cincinnati*, 622 F.3d 524 (6th Cir. 2010).....................................25

*Miller v. Johnson*, 515 U.S. 900 (1995)...................................................12

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972)....................................18

*Procunier v. Martinez*, 416 U.S. 396 (1974) ............................................22

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)...................1

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) .......................................9

*Tennessee v. Becerra*, 117 F.4th 348 (6th Cir. 2024)....................................8

*Timbs v. Indiana*, 586 U.S. 146 (2019)...................................................18

*Tyson Foods v. McReynolds*, 865 F.2d 99 (6th Cir. 1989) .......................................25

*United Pet Supply, Inc. v. City of Chattanooga, Tennessee*, 768 F.3d 464 (6th Cir. 2014)................................................................21

*United States v. O'Brien*, 391 U.S. 367 (1968) ...........................................9

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ............................................ 15, 18

*Williams v. Fears*, 179 U.S. 270 (1900) ................................................18

*Zinermon v. Burch*, 494 U.S. 113 (1990)....................................................21

## ISSUES PRESENTED

1. Are Defendants likely violating Plaintiffs' First Amendment rights by banning them from the entire University of Michigan campus (or campuses), and thus from engaging in protected speech on campus, in response to unproven and undisclosed allegations that Plaintiffs engaged in minor misconduct at a protest?

2. Are Defendants likely violating Plaintiffs' Fourteenth Amendment substantive due process rights to freely navigate and remain on public spaces by banning them from the entire University of Michigan campus (or campuses), which constitute the heart of the Ann Arbor community, in response to unproven and undisclosed allegations that Plaintiffs engaged in minor misconduct at a protest?

3. Are Defendants likely violating Plaintiffs' Fourteenth Amendment procedural due process rights by banning them from campus without first offering a pre-deprivation hearing for them to contest the issuance of their ban?

4. Are Defendants likely violating Plaintiffs' procedural due process rights by failing to give them (1) sufficient notice of Defendants' reason for banning them from campus, including any meaningful explanation or evidence; and (2) the opportunity to contest the issuance of their full-campus ban before a fair and neutral adjudicator outside of the campus police department?

5. Assuming the Court finds that Defendants' actions are likely unconstitutional for any of the reasons stated in issues (1)–(4), should a preliminary injunction issue?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

U.S. Const. amend. I
U.S. Const. amend. XIV, § 1
42 U.S.C. § 1983

**Caselaw Pertaining to First Amendment Issue**

*Lichtenstein v. Hargett*, 83 F.4th 575 (6th Cir. 2023)
*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994)
*Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2005)
*Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536 (D. Vt. 2014)
*Hicks v. Crowley*, 2023 WL 348229 (S.D. Ohio 2023)
*Johnson v. Bayens*, 2020 WL 12618873 (S.D. Iowa 2020)

**Caselaw Pertaining to Substantive Due Process Issue**

*Washington v. Glucksberg*, 521 U.S. 702 (1997)
*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002)
*Kennedy v. City of Cincinnati*, 595 F.3d 327 (6th Cir. 2010)

**Caselaw Pertaining to Procedural Due Process Issues**

*Mathews v. Eldridge*, 424 U.S. 319 (1976)
*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)
*Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399-400 (6th Cir. 2017)
*Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 566 (6th Cir. 2011)

## INTRODUCTION

The University of Michigan (the "University") has long been a site of activism and protest on countless issues, and it lies at the civic and cultural heart of the Ann Arbor community. As has been the case nationwide, campus protests over the last sixteen months have often focused on the devastating events in Palestine and Israel. The University has responded aggressively. Relevant here, it has banished protestors, such as Plaintiffs, from campus for an entire year based on unproven suspicions, and undisclosed evidence, that Plaintiffs violated university policies or criminal laws when they participated in on-campus protests. The Constitution does not permit such arbitrary restrictions on Plaintiffs' speech and movement anywhere. But that is *especially* true in the "college classroom" and "its surrounding environs," which are "peculiarly the marketplace of ideas." *Healy v. James*, 408 U.S. 169, 180 (1972). Indeed, in the university setting, "the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835 (1995).

Because the University's actions here violate core First Amendment principles and Plaintiffs' substantive and procedural due process rights, Plaintiffs move this Court for a preliminary injunction allowing them to return to their regular lives as students, community members, and impassioned activists.

## BACKGROUND AND FACTS

### I.      The University of Michigan's General Use of Trespass Bans

The University of Michigan's Ann Arbor campus is the geographic and civic heart of the Ann Arbor community. As such, it is often a site of political activism that attracts University-affiliated community members and members of the general public. *See* Verified Compl. ("Compl.") ¶¶ 35-38. Over the last sixteen months, the campus has seen multiple protests relating to the policies and military actions of the State of Israel, and calling for the University to divest from companies with ties to Israel or boycott Israeli institutions. *Id.* at ¶¶ 55-65. The University of Michigan Police Department's ("UMPD's") response has included arrests, physical assaults (including with chemical sprays), and other harsh tactics. *See id.* This lawsuit focuses on one common response to the protests: the widespread issuance of full-campus trespass bans to pro-Palestine protestors whom UMPD officers allege acted unlawfully, disruptively, dangerously, or in violation of University policies.

The University of Michigan Division of Public Safety and Security ("DPSS") authorizes UMPD officers to ban individuals from some or all of campus, or even all three of the University's campuses, via a process it euphemistically calls "trespass warnings." *See* Compl. Ex. B (the "Trespass Policy"). Pursuant to that policy, a UMPD officer can issue an individual a "warning" that they will be subject to arrest and prosecution for criminal trespass under Michigan law if they return to specified

parts of campus designated in the warning (hereafter a "trespass ban"). The Trespass Policy authorizes UMPD officers to issue a trespass ban if they believe that any of four things occurred: an individual "[c]ommitted or is suspected of committing a crime" on campus, "[r]efused or failed to comply with established University rules," "[d]isrupted lawful operations and functions of the University," or "[d]emonstrated a risk of physical harm or injury to others or property." *Id.* § 4.A.

All trespass bans last for one year. *Id.* § 4.E. However, recent practice suggests that the University will presumptively renew many, and perhaps most, trespass bans annually. Declaration of Stacie Greskowiak McNulty ("McNulty Decl.") ¶¶ 32-38, attached hereto as Exhibit 1.

UMPD officers issuing a trespass ban utilize a form (hereinafter a "trespass form"), in which they check off one or more of the four reason(s) for imposing a ban, but do not list any supporting facts or allegations. *See* Compl. ¶ 45. Issuance is entirely at the discretion of the issuing officer and no supervisory authorization is needed before issuing a ban. *See* Compl. Ex. B § 4.D.

Recipients may challenge a trespass ban only *after* it is issued. First, they may request a so-called "formal hearing" with Defendant UMPD Chief James. *Id.* § 8. They may then appeal Defendant James's decision to Defendant DPSS Executive Director Washington, whose decision is final. *Id.* § 9.C.

The University's early use of trespass bans against protestors was fairly

3

limited—e.g., banning protestors from coming back to a particular building where they conducted a sit-in. McNulty Decl. ¶¶ 13-14. With time, however, the issuance of trespass bans quickly escalated. UMPD officers now issue protestors full-campus bans—sometimes multi-campus bans—for minor alleged misconduct, effectively banishing protestors from the University community entirely. *Id.* at ¶¶ 15-18.

## II.    The Trespass Bans Issued to Plaintiffs and Their Ongoing Impact

Plaintiffs are among the protestors to receive full-campus trespass bans after participating in a protest. Each Plaintiff's experience is detailed in the Verified Complaint and summarized below. *See* Compl. ¶¶ 76-91 (Mr. Zou), ¶¶ 100-111 (Ms. Elliott), ¶¶ 112-125 (Mr. Grant), ¶¶ 126-139 (Mr. Vieira).

***Plaintiff Jonathan Zou*** is an undergraduate student at the University. *Id.* at ¶ 11. He was issued a trespass ban after participating in a protest at which he was arrested, but never charged, for allegedly using a megaphone. *Id.* at ¶¶77-81. The ban stated that he was banned from the entire Ann Arbor campus except to go to class. *Id.* The next day, UMPD suddenly amended his ban "to include all of the Ann Arbor campus, Flint and Dearborn. You cannot attend class in person." *Id.* at ¶ 82.

Zou requested a hearing to object to the ban. *Id.* at ¶¶ 84-87. At the hearing, Defendant James refused to explain why he had gotten a trespass ban, instead demanding he tell her why she should amend his ban. *Id.* Zou offered to provide her with a list of his classes, but Defendant James kept his total ban in place. *Id.*; Compl.

4

Ex. E. Zou appealed, this time to Defendant Washington. Compl. ¶¶ 88-89. Despite still not telling Zou why he was issued a trespass ban, Defendant Washington amended the ban to allow Zou to go to class. *Id.*; Compl. Ex. F.  By this point, Zou had missed nearly a month of classes. *See* Compl. ¶ 88.  Today, Zou is allowed on campus for class and other academic obligations, but is still prohibited from being on campus for any other reason, including to eat at campus dining halls and attend protests, student organization meetings, and any other event or gathering. *Id.* at ¶ 90.

**Plaintiff Alice Elliott** is a 2018 graduate of the University. *Id.* at ¶ 17. She lives in Ypsilanti and works as an emergency medical technician ("EMT") at a local ambulance service, and as a part-time hospital technician at the University of Michigan's medical center. *Id.* at ¶ 18. She was issued a trespass ban on August 28, 2024, after attending a protest at which UMPD officers arrested her when she attempted to offer medical assistance to a protestor who had been tackled by a police officer. *Id.* at ¶¶ 100-106. The ban applies to the entire Ann Arbor campus and is effective for one year. *Id.*; Compl. Ex. H.

As a result, Elliott cannot enter University buildings to which she had alumni access (such as the library), attend protests or other demonstrations, meet and strategize with activist student groups, or participate in other public events and workshops that are beneficial for her professional growth. *Id.* at ¶¶ 107-110. The ban impedes her ability to safely work as an EMT, which can require her to transport

burn victims to the university medical center, and as a part-time hospital technician, where she is expected to be physically present in the medical center. *Id.*

**Plaintiff Christian Grant** is an Ypsilanti resident who is frequently on campus to complete DoorDash food deliveries and to participate in meetings with student groups related to Palestine and other social justice issues. *Id.* at ¶¶ 22-23. He was issued a trespass ban after participating in a September 24, 2024 protest. *Id.* at ¶¶ 112-115. After Grant left the protest, UMPD officers pulled over his car for allegedly running a red light. *Id.* While pulled over, a UMPD officer issued Grant a year-long trespass ban for the entire Ann Arbor campus. *Id.*; Compl. Ex. I.

Grant requested a hearing to object to the ban. Compl. ¶¶ 117-120. At the "formal hearing," Defendant James refused to explain why he had gotten a trespass ban beyond alluding to a potential criminal investigation, and decided to keep his total ban in place. *Id.*; Compl. Ex. J. Grant appealed to Defendant Washington. *Id.* at ¶¶ 121-122. At this second hearing, Defendant Washington's designee similarly refused to detail the allegations against Grant, again simply alluding to a criminal investigation that has not resulted in any criminal charges. *Id.* The designee decided to keep his total ban in place. *Id.* at ¶ 123; Compl. Ex. K.

Grant remains banned from being on campus for any reason, including to attend protests, community meetings, and any other event or gathering on the University's Ann Arbor campus. *Id.* at ¶¶ 116, 123. He cannot pick up DoorDash

orders from on-campus restaurants or drop them off to on-campus residents, which limits his work opportunities and reduces his pay. *Id.*

**Plaintiff Gabriel Vieira** is a 2024 graduate of the University of Michigan's economics master's program, and he still lives in Ann Arbor. *Id.* at ¶ 25. While still a student, he was issued a trespass ban after attending a May 3, 2024 protest in front of the University's art museum. *Id.* at ¶¶ 126-132. There, UMPD officers detained him and issued him a year-long full-campus trespass ban. *Id.*; Compl. Ex. L. This rendered Vieira unable to return to his on-campus housing, attend graduation, or go to his on-campus job. *Id.* After Mr. Vieira begged to be able to return to his campus dorm, the UMPD officers handwrote an exception for "Munger Graduate Residence." *Id.*

Vieira requested a hearing to object to the ban, but the University never responded. *Id.* at ¶¶ 133-135. Only after his attorney got involved did Mr. Vieira secure a "formal hearing." *Id.* At the hearing, Defendant James refused to explain why Vieira had gotten a trespass ban, instead asking him to tell her why she should amend it. *Id.* Mr. Vieira raised his inability to go to work and meet with professors in-person to help him with his Ph.D. applications. Defendant James upheld the ban as written. *Id.*; Compl. Ex. M. Vieira graduated without being able to return to campus to attend his own graduation or continue his work. Compl. ¶¶ 136-138.

Vieira's trespass ban continues to disrupt his daily life and his right to speak

and assemble freely. He is unable to meet in-person with professors to prepare Ph.D. applications, and he lost an offer to continue his on-campus job and two additional research assistant positions. *Id.* Like the other Plaintiffs, Vieira cannot attend protests or organizing meetings or any other event or gathering on campus. *Id.*

## ARGUMENT

On a motion for preliminary injunctive relief, a district court must consider:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Tennessee v. Becerra*, 117 F.4th 348, 357 (6th Cir. 2024) (quotations omitted). "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) (quotations omitted).

Here, all four factors weigh strongly in Plaintiffs' favor.

## I.    Plaintiffs Are Likely to Succeed on the Merits.

### A.    Plaintiffs are likely to succeed on the merits of their First Amendment claim.

By prohibiting Plaintiffs from returning to campus, the trespass bans necessarily prohibit Plaintiffs from engaging in several forms of constitutionally protected speech such as protesting, handing out fliers, and meeting and speaking

with student groups active in the pro-Palestine movement or other causes. Governmental restrictions such as these, which purport to ban conduct but which also limit the ability of individuals to engage in constitutionally protected speech, are analyzed under a tiered approach. Such restrictions are subject to strict scrutiny if they "restrict the 'inputs' that speakers use to express a message," including by "target[ing] certain speakers." *Lichtenstein v. Hargett*, 83 F.4th 575, 585 (6th Cir. 2023) (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571 (2011)). For example, in *Meyer v. Grant*, 486 U.S. 414, 420 (1988), a Colorado law prohibiting conduct— i.e., the use of paid circulators to gather signatures for petitions—was subject to (and did not survive) strict scrutiny because the law meant initiative campaigns "could not pay circulators, [so] fewer 'voices' could convey their message." *Lichtenstein*, 83 F.4th at 585 (discussing and quoting *Meyer*, 486 U.S. at 422). When strict scrutiny applies, it requires the government to demonstrate a "compelling" governmental interest in regulating the conduct in question and that the regulation is "narrowly tailored" to that interest. *Lichtenstein*, 83 F.4th at 597 (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)).

When strict scrutiny does not apply, legislative bans on conduct that incidentally limit speech are governed by a more "lenient" test articulated by the Supreme Court in *United States v. O'Brien*, 391 U.S. 367 (1968). *See Lichtenstein*, 83 F.4th at 584. However, the test is significantly more demanding when the

restriction on conduct that implicates speech is not a *legislative* ban, but, as here, is imposed by individual governmental agents against particular speakers.

The leading case on such speech-restrictive bans on conduct is *Huminski v. Corsones*, 396 F.3d 53, 92 (2d Cir. 2005). There, the Second Circuit analyzed the First Amendment implications of a trespass ban that prohibited an anti-judiciary gadfly from coming to the courthouse unless he was expressly summoned by a judge. Even though courthouses are non-public forums where restrictions on speech are often upheld, *Huminski* explained that the First Amendment analysis was more rigorous than usual. *See id.* That was so because, "distinct from a generally applicable municipal ordinance and [instead] like an injunction," a trespass notice handed out by individual governmental agents "'carr[ies] greater risks of censorship and discriminatory application than do general ordinances.'" *Id.* (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994) (applying similar analysis to judicial injunctions limiting the time, place, or manner of speech)). Accordingly, when strict scrutiny does not apply, courts analyzing trespass bans, even in *nonpublic* forums and even when the conduct giving rise to the ban was not itself constitutionally protected, must "pay especially 'close attention to the fit between the objectives of the [trespass] notices and the restrictions they impose on speech.'" *Huminski* 396 F.3d at 92 (quoting *Madsen*, 512 U.S. at 765 (cleaned up)).

Applying *Huminski* to trespass bans in forums that, like the ones at issue here,

are either public, limited public, or non-public forums, courts require that bans "burden no more speech than necessary to serve a significant government interest." *Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536 (D. Vt. 2014) (quoting *Madsen*, 512 U.S. at 765) (invalidating a trespass ban from school-owned property despite intimidating behavior by a parent); *see also Johnson v. Bayens*, 2020 WL 12618873 (S.D. Iowa 2020) (analyzing trespass bans at the Iowa state capitol complex under a similar framework).

The same test has been applied within the Sixth Circuit. In *Hicks v. Crowley*, 2023 WL 348229 (S.D. Ohio 2023), the court relied on *Huminski* and *Cyr* to invalidate a trespass ban prohibiting a disruptive "government transparency advocate" from attending public hearings of the Ohio Board of Tax Appeals. *See id*.

In this case, the trespass bans prevent Plaintiffs from joining and making their voices heard at on-campus protests that are core political speech. The bans therefore "target certain speakers" and ensure "fewer voices" at protests. *Lichtenstein*, 83 F.4th at 585. As such, they are best analyzed under a strict scrutiny framework. *See id.*; *Meyer*, 486 U.S. at 420–22. But if this Court finds that strict scrutiny is not the applicable standard, the demanding standard courts have applied to injunctions and other trespass bans under *Madsen*, *Huminski*, *Cyr*, *Johnson*, and *Hicks* should apply, thus requiring Defendants to show, *at the least*, that the bans serve a "significant" government interest and "burden no more speech than necessary" to serve that

11

interest, paying especially close attention to the fit between the government interest and the scope of the restriction. *Madsen*, 512 U.S. at 765.

The trespass bans cannot survive either of these demanding levels of scrutiny. Under strict scrutiny, Defendants' imposition of one-year, full-campus bans is not nearly "narrowly tailored" to serve *any* compelling government interest, whether it be public safety, efficient university operations, or some other unstated interest.[2] Each of the bans extends to the entire University campus in a blunderbuss fashion, regardless of what each individual Plaintiff was accused of doing. None of the bans contains exceptions for any constitutionally protected speech- or protest-related activities, including in public forums designated for such purposes where the highest levels of First Amendment protection apply. Quite simply, the bans weren't tailored *at all*, let alone narrowly. They certainly cannot survive strict scrutiny, the "most rigorous and exacting standard of constitutional review," *Miller v. Johnson*, 515 U.S. 900, 920 (1995).

This Court should reach the same result even if the *Madsen-Huminski* test applies instead of strict scrutiny; because the trespass bans "burden" far more "speech than necessary" to serve any "significant" government interest, *Madsen*, 512 U.S. at 765, they violate the First Amendment. Regardless of what interest the

---

[2] The Trespass Policy states that the University issues trespass bans "[f]or the protection of the community and to reduce the disruption of university activities." Compl. Ex. B, § 1.

government has in banning Plaintiffs, it defies belief to think that they need to be banned from *the entire* campus for *an entire year* (with a significant likelihood of renewal) in order to achieve that objective.

The circumstances surrounding the issuance of each trespass ban at issue in this case highlights this point: Mr. Zou and Ms. Elliott were issued trespass bans after having attended two separate protests on two different parts of the Diag, with Zou alleged to have used a megaphone and Elliott alleged to have attempted to offer medical assistance to a protestor police had injured. Compl. ¶¶ 77-78 (Zou); ¶ 103 (Elliott).

Mr. Vieira was issued a trespass ban for unexplained reasons after having attended a protest in front of the university art museum. *Id*. ¶¶ 126-28. Mr. Grant was issued a trespass ban after having already left a march through campus and in front of Angell Hall. *Id.* ¶113-14. And yet, regardless of each Plaintiff's unique circumstances, Defendants banned all of them from virtually the entire campus, rendering them unable to participate in any constitutionally protected speech activity regarding any topic on any part of campus for one year.

This includes a wide variety of non-protest speech activities at which the alleged violative conduct has no real possibility of recurring. Plaintiffs cannot, for example, quietly pass out flyers for a political candidate on the corner of State St. and South University Ave. They cannot walk across the Diag wearing a shirt that

expresses a political view. They cannot even drive through campus with a bumper sticker affixed to their car. And none of the bans attempts to specifically address the minor violations of university policy or criminal law the University alleges each Plaintiff committed. The simple fact is that banning anyone who commits (or is *suspected* of committing) a violation of law or policy—even if the act is not constitutionally protected—from participating in countless acts of protected speech comes nowhere close to burdening no more speech than necessary to serve any significant governmental interest.

Because Defendants completely failed to tailor the scope of the trespass bans to a significant interest, *Madsen*, 512 U.S. at 765, the bans violate the First Amendment. The First Amendment cannot tolerate such a slapdash response to Plaintiffs' participation in protests concerning serious global issues in a campus environment historically known for its robust political activism.

### B.     Plaintiffs are likely to succeed on the merits of their substantive due process claim.

The trespass bans suffer from another independent constitutional flaw: they violate Defendants' substantive due process rights. Any deprivation of rights so fundamental that they are guaranteed by principles of substantive due process are subject to strict scrutiny. *See Bambach v. Moegle*, 92 F.4th 615, 624 (6th Cir. 2024) ("[T]he government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose."); *Dep't of State v.*

*Munoz*, 602 U.S. 899, 910 (2024) (similar). Such rights are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

The Sixth Circuit has already recognized two relevant substantive due process interests that Defendants have encroached upon here: (1) the right to freely move about one's community and (2) the right to remain in a public place.

> ### i.   *Defendants are violating Plaintiffs' fundamental right to freely move about their local community.*

By banning Plaintiffs from stepping foot on virtually any part of campus, Defendants are depriving them of their fundamental right to freely traverse the many sidewalks, roadways, park-like public spaces, theaters, restaurants, museums, and other facilities that fill campus. These areas and facilities collectively constitute the cultural lifeblood not only of the University, but of the entire Ann Arbor community, and there is a long and rich history of such spaces being the center of civic life in Ann Arbor. Compl. ¶¶ 35-38.

The Sixth Circuit has recognized that substantive due process protects the "right to travel locally through public spaces and roadways." *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002). Indeed that right, "perhaps more than any other right secured by substantive due process—is an everyday right, a right we depend on to carry out our daily activities. It is, at its core, a right of function." *Id.* at 498. "Freedom of movement is basic in our scheme of values" and dates back to

"as early as the Magna Carta." *Kent v. Dulles*, 357 U.S. 116, 126 (1958).

*Johnson* involved a Cincinnati ordinance that automatically banned individuals from "public streets, sidewalks, and other public ways" in designated "drug-exclusion zones" if they were taken into police custody in any such zone for a drug offense. *Id.* 487-88. The zone-wide bans generally lasted ninety days and could be extended for an additional year upon conviction. *Id.* Violators of the ban could be prosecuted for trespassing. *Id.* at 488. The bans at issue in *Johnson* extended to a neighborhood of 10,000 residents, depriving the plaintiffs of their ability to visit family, access social services, and/or meet with their lawyers. *Id.* at 489.

The Sixth Circuit held that the bans "plainly infringe[d] on" the substantive due process right to travel locally through public spaces and roadways and thus triggered strict scrutiny. *Id.* at 502-03. This was so even though the ordinance entitled individuals to a variance if they lived, worked, or received social services in a drug-exclusion zone. *Id.* at 505.

The trespass bans here are strikingly similar to—if not worse than—the ones struck down in *Johnson*. As in *Johnson*, Plaintiffs here have been absolutely banned from an entire geographic area, but the campus here is noticeably larger and more populous than the neighborhood at issue in *Johnson*—and, in fact, is the beating civic heart of the entire Ann Arbor community. Plaintiffs here have been banned from campus for an entire year (with a likelihood of renewal), unlike the ninety-day

bans in *Johnson*. And while the *Johnson* plaintiffs were entitled to variances for living, working or receiving social services in the area from which they were banned, Plaintiffs here have been prevented from returning to work, attending protests, and virtually any other on-campus activity other than seeking care at the medical center. Further, the bans in *Johnson* reflected a legislative attempt to address drug crime in a way that applied equally to all arrestees, whereas the University's trespass ban regime relies on individual discretionary decisions based on mere allegations by police officers. Thus, *Johnson* applies fully here and subjects the bans to strict scrutiny, which they cannot survive for the reasons stated in Section I.B.iii, *infra*.

### ii. Defendants are violating Plaintiffs' fundamental right to remain in a public place.

By banning Plaintiffs from entering and being present on any part of campus for one year, Defendants are also depriving them of their related fundamental right to "'remain in a public place of [their] choice.'" *Kennedy v. City of Cincinnati*, 595 F.3d 327, 336 (6th Cir. 2010) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 54 (1999)). In *Kennedy*, the plaintiff, after being accused of watching children at a city-run pool, was banned from all city-run recreational facilities that were generally open to the public. *Kennedy*, 595 F.3d at 332-34. Drawing upon a century-long line of cases regarding the right to innocently loiter, the Sixth Circuit found that the plaintiff had a right to enter and remain on public property that was so clearly established as to overcome qualified immunity, and was thus entitled to due process

before being banned from city property. *Id.* at 336-38.

As *Kennedy* recognized, the right to remain in a public place features all of the key elements of a fundamental right protected by substantive due process. Most importantly, it is clear that the right to remain in a public place is "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 721. Over a century of U.S. Supreme Court caselaw has recognized and developed the right to innocently loiter. *See, e.g., Williams v. Fears*, 179 U.S. 270, 274 (1900); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 164 (1972); *City of Chicago v. Morales*, 527 U.S. 41, 53-54 (1999) (plurality opinion). Moreover, as the plurality pointed out in *Morales*, the history of the right to remain in a public place stretches back centuries further to Blackstone's Commentaries. *Morales*, 527 U.S. at 54. *See also Timbs v. Indiana*, 586 U.S. 146, 151-52 (2019) (noting that reference to Blackstone's Commentaries is one way to determine that a liberty interest rises to the level of a fundamental right); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 238 (2022) (same).

Indeed, the fundamental right to freely move about one's local community (discussed above) goes hand-in-hand with a fundamental right to *remain* in public places within that local community. In many ways, the right to move throughout one's community and then to stay in a place that one moves to constitute the most basic rights that are "implicit in the concept of ordered liberty," *Glucksberg*, 521 U.S. at 721, and are "'a part of our heritage,'" *Kent*, 357 U.S. at 126.

This right applies with full force here. As in *Kennedy*, Defendants here have banned Plaintiffs from entering and remaining on parts of campus that are accessible to the general public (e.g., parks, sidewalks, and roadways). Worse, Defendants have banned Plaintiffs from *all* public parts of campus that are under Defendants' control, whereas the plaintiff in *Kennedy* was banned only from certain public places (namely, city-run recreational facilities) akin to the one where he was accused of immoral conduct. The bans here extend to museums, theaters, bus stops, coffee shops, park-like spaces like the Diag, countless potential places of employment, and housing facilities where many Plaintiffs' friends and colleagues reside. Such vast bans cannot survive strict scrutiny for the reasons stated in Section I.B.iii, *infra*.

### iii.     The trespass bans cannot survive strict scrutiny.

Having deprived Plaintiffs of the two substantive due process rights described above, Defendants' issuance of the trespass bans can pass constitutional muster only if it overcomes strict scrutiny. But a one-year full-campus ban based on a single police officer's allegation of problematic conduct at a single protest is in no way "necessary" or "narrowly tailored" to serve *any* compelling state interest, regardless whether it is public safety, efficient university operations, or some other interest.[3] *Bambach*, 92 F.4th at 624  (requiring the restriction to be "necessary"); *Munoz*, 602 U.S. at 910 (requiring the restriction to be "narrowly tailored"). Plaintiffs here

---

[3] *See supra* note 2.

19

appear to be accused of minor conduct (e.g., using a megaphone for Mr. Zou or rendering aid to an injured protestor for Ms. Elliott) or for reasons unstated and unknown (for Mr. Vieira and Mr. Grant). Banning people from virtually the entire campus, which is the civic center of the Ann Arbor community, for such alleged (or unspecified) conduct reflects no tailoring whatsoever, regardless of what compelling purpose the University purports to be pursuing.

A one-year full-campus ban is not the "least restrictive means" required to survive strict scrutiny. *Johnson*, 310 F.3d at 503. *See Dunn v. Blumstein*, 405 U.S. 330, 343 (1972) ("[I]f there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference."). The trespass bans violate Plaintiffs' due process rights.

### C. Plaintiffs are likely to succeed on the merits of their two procedural due process claims.

The bans also suffer from two severe defects that violate procedural due process: the lack of a pre-deprivation hearing and woefully inadequate process at the post-deprivation hearing. These defects unconstitutionally infringed upon Plaintiffs' liberty interests in moving about and remaining on campus, *see supra* Section I.B, and in freely exercising their First Amendment rights, *see supra* Section I.A.

### i. The lack of pre-deprivation hearings violates procedural due process standards.

The trespass bans violate Plaintiffs' procedural due process rights because

Defendants failed to provide an opportunity to contest the bans *before* imposing them. The Supreme Court has long recognized that a pre-deprivation hearing is "the root requirement of the Due Process Clause." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (cleaned up). Thus, due process "usually . . . requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). Generally, there are two exceptions to this rule—namely, "[1] where a State must act quickly, or [2] where it would be impractical to provide predeprivation process." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997).

Neither exception applies here. First, when the trespass bans were issued, it could not have "reasonably believed that immediate action was necessary to eliminate an emergency situation." *United Pet Supply, Inc. v. City of Chattanooga, Tennessee*, 768 F.3d 464, 486 (6th Cir. 2014). None of the trespass bans were issued when any Plaintiff was actively engaging in the alleged misconduct. Instead, Plaintiffs had either left or been removed from the protests they attended *before* being given a trespass ban. *See* Compl. ¶¶ 79-80 (Zou); 103-106 (Elliott); 114 (Grant); 127-129 (Vieira). And none of the conduct Plaintiffs allegedly engaged in—using a megaphone, offering medical care to a protestor, or some other unspecified allegation—remotely created an imminent threat to the University or the community.

Nor were pre-deprivation hearings for Plaintiffs impracticable. The need for routine procedures to implement the Trespass Policy was foreseeable and it would

be simple to hold prompt pre-deprivation hearings in these non-emergency cases. Hearings are scheduled with little lead time, *see, e.g., id.* at ¶¶ 84-85, and are not elaborate, meaning that having a hearing *before* effectuating a trespass ban would be simple and practical—especially where, as here, the alleged conduct underlying the ban does not present an imminent threat to the safety of the community.

In addition to the two *Gilbert* exceptions, courts will sometimes uphold a lack of pre-deprivation process under the test enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), so long as post-deprivation process is provided. *See Johnson v. Morales*, 946 F.3d 911, 922 (6th Cir. 2020). That test weighs (1) the nature of "the private interest" being deprived; (2) "the risk of erroneous deprivation" and (3) the "fiscal and administrative burdens" posed by providing additional process. *Id.*

All three *Mathews* factors favor a pre-deprivation hearing here. First, Plaintiffs have significant liberty interests in being able to move about and remain in their community, *see supra* Section I.B., as well as in freely exercising their First Amendment rights. *See Procunier v. Martinez*, 416 U.S. 396, 417-18 (1974); *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 648 (6th Cir. 2015). Second, the risk of erroneously depriving Plaintiffs of these interests is large: Plaintiffs were banned based on allegations made by a single police officer who was not even required to inform Plaintiffs of the allegations. *See* Compl. ¶¶ 39-41. Without a pre-deprivation hearing, Defendants could not consider the "wide variety of information

[that] may be deemed relevant" nor the "credibility and veracity" of the accusing police officer. *Johnson v. Morales*, 946 F.3d at 924. Third, the burdens of providing a pre-deprivation hearing would not be significant, particularly given that hearings are informal and quickly scheduled. *See* McNulty Decl. ¶¶ 24-25; Compl. ¶¶ 84-85.

### ii. The minimal procedures in the post-deprivation hearings do not satisfy due process.

Defendants further violated Plaintiffs' procedural due process rights by providing post-deprivation hearings that lack both sufficient notice of the allegations being made and an impartial adjudicator. *See Mathews*, 424 U.S. at 333.

As explained above, the risk of an erroneous deprivation is critical to determine when procedural due process has been violated. *Supra* Section I.C.i., pp. 22-23. In the student discipline context, this means the government must provide, at least, "notice of the charges, an explanation of the evidence against the student, and an opportunity to present his side of the story before an unbiased decision maker." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399-400 (6th Cir. 2017).

As to notice, Defendants never provided Plaintiffs with sufficient notice of why they were each being banned from campus. Nowhere on the trespass ban form, or in any subsequent hearing, did Defendants explain, for example, which possible crime(s) were violated or how university operations were disrupted. *See, e.g.*, Compl. ¶¶ 130, 134 (Mr. Vieira). And when asked to provide *any* evidence in support of the bans at the hearing, Defendants expressly refused. *Id.* at ¶ 118 (Mr. Grant).

Defendants also failed to provide "an impartial decisionmaker," which is an "axiomatic" constitutional requirement. *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 566 (6th Cir. 2011) (quotations omitted). Both levels of appellate review that Defendants offered Plaintiffs were unreasonably biased because they were housed within the same University department (DPSS) that issued the bans in the first place. The adjudicators were, in fact, supervisors of the police officers who issued the trespass bans and likely spoke to those officers on an *ex parte* basis before the hearings. *See* Compl. ¶¶ 85, 88 (Zou); 118, 121 (Grant); 133 (Vieira).

Without notice of the allegations against them and an impartial adjudicator, there was no meaningful way for Plaintiffs to respond, explain, and defend themselves. This flatly fails due process's baseline notice and fairness requirements.

## II.   Plaintiffs Will Suffer Irreparable Injury Absent a Preliminary Injunction.

Plaintiffs demonstrate irreparable and ongoing constitutional injuries that will continue for the remainder of their one-year ban absent a preliminary injunction.

When "a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *ACLU of Ky. v. McCreary Cnty.*, *Ky.*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd*, 545 U.S. 844 (2005). That is especially so for violations of the First Amendment. "[I]t is well-settled that loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quotations

omitted). Thus, a preliminary injunction is not only appropriate, but *necessary* to prevent ongoing irreparable violations of Plaintiffs' constitutional rights.

## III.    Issuing a Preliminary Injunction Will Not Substantially Harm Others.

As a matter of law, a party cannot claim that it will be harmed by an injunction if the enjoined conduct is unconstitutional. *See Tyson Foods v. McReynolds*, 865 F.2d 99, 103 (6th Cir. 1989) (recognizing there is "no right to the unconstitutional application of state laws"); *see also Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001) (same). Here, Plaintiffs seek a preliminary injunction prohibiting Defendants from enforcing the unconstitutional trespass bans and from issuing similar bans. Such an injunction will remedy ongoing constitutional violations and not harm others.

## IV.    The Public Interest Will Be Served by a Preliminary Injunction.

The final factor is whether an injunction will serve the public interest. Again, Plaintiffs' likelihood of success on the merits largely resolves this factor. "When a constitutional violation is likely, . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010).

**CONCLUSION**

For these reasons, the requested preliminary injunction should be granted.

/s/ Ramis J. Wadood

25

Respectfully submitted,

/s/ Ramis J. Wadood
Ramis J. Wadood (P85791)
Philip E. Mayor (P81691)
Bonsitu Kitaba-Gaviglio (P78822)
Delaney Barker (P87401)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Avenue
Detroit, MI  48201
(313) 578-6800
rwadood@aclumich.org

John C. Philo (P52721)
Liz Jacob (P86981)
Anthony D. Paris (P71525)
SUGAR LAW CENTER
FOR ECONOMIC & SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, MI 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
ljacob@sugarlaw.org
tparis@sugarlaw.org

Amanda M. Ghannam (P83065)
Jack W. Schulz (P78078)
Cooperating Attorneys,
American Civil Liberties Union
   Fund of Michigan
645 Griswold St. Suite 4100
Detroit, MI 48226
(313) 788-7446
amanda@michiganworkerlaw.com
jack@michiganworkerlaw.com

Attorneys for Plaintiffs

Dated: February 3, 2025