IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN ZOU et al.,

    Plaintiffs,

 v.

SANTA J. ONO et al.,

    Defendants.

Case No. 2:25-cv-10315

Hon. Mark A. Goldsmith

Mag. Elizabeth A. Stafford

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

    I.    Defendants Misdescribe the Facts in Revealing Ways. ......................... 1

    II.    The Trespass Bans Are Subject to Heightened First Amendment Scrutiny and Are Not Tailored to Survive any Level of Scrutiny. .................................................................................. 4

    III.    The Trespass Bans Closely Resemble the Unconstitutional Restrictions on Travel in *Johnson v. City of Cincinnati*. ....................... 6

    IV.    The Bans Were Imposed Without Procedural Due Process. ................. 9

LOCAL RULE CERTIFICATION ...................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*Barton v. City of Ann Arbor*, No. 2:23-cv-11423, 2024 WL 4193751 (E.D. Mich. Sept. 13, 2024) ..............................................................................10

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ......................................................9

*Does v. Whitmer*, No. 22-cv-10209, 2024 WL 4340707 (E.D. Mich. Sept. 27, 2024) ...................................................................................................................7

*Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, (7th Cir. 2012) ...................8

*Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2005) ..................................................5

*Jefferson v. Jefferson Cnty. Pub. Sch. Sys.*, 360 F.3d 583 (6th Cir. 2004) ................9

*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002) ...............................7, 8

*Kennedy v. City of Cincinnati*, 595 F.3d 327 (6th Cir. 2010) ..................................9

*Lovern v. Edwards*, 190 F.3d 648 (4th Cir. 1999) ...................................................6

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) ...........................4, 6

*McComas v. Bd. of Educ. Rock Hill Loc. Sch. Dist.*, No. 07-cv-573, 2009 WL 10679743 (S.D. Ohio Nov. 5, 2009) ...................................................................7

*Siders v. City of Brandon*, 123 F.4th 293 (5th Cir. 2024) .......................................6

*United States v. Stevens*, 559 U.S. 460 (2010) ........................................................9

*Wright v. City of St. Petersburg*, No. 8:13-cv-2784, 2014 WL 7273946 (M.D. Fla. Dec. 19, 2014) ..............................................................................................6

Plaintiffs are not "stunned that they are facing consequences for their actions." Defs.' Resp. at 1; PageID.204. They are stunned Defendants have responded to peaceful campus protests by imposing sweeping consequences in the absence of meaningful constitutional safeguards. Plaintiffs therefore seek to lift their trespass bans—i.e., restore the *status quo ante*— while this litigation proceeds.

**I.    Defendants Misdescribe the Facts in Revealing Ways.**

Defendants misstate and mischaracterize the facts in ways that warrant a number of corrections. But before discussing those inaccuracies, two general observations are in order. First, Defendants attempt to falsely paint Plaintiffs as repeat offenders whose "history of disruptive and unlawful conduct" culminated in full-campus trespass bans. Defs.' Resp. at 7-9; PageID.210-212; *see also id.* at 1. But behind this blunderbuss strategy lurks a basic contrary fact: Plaintiffs were each banned from campus by a *single* police officer based on allegations that they engaged in a *single* act of misconduct at a protest. None of the Plaintiffs were ever told that their trespass bans were based on any prior misconduct. *See* Ex. A (Zou Decl.), ¶3; Ex. B (Vieira Decl.), ¶7; Ex. C (Grant Decl.), ¶2; Ex. D (Elliott Decl.), ¶7. In fact, Defendants effectively admit this when discussing Plaintiffs' procedural due process claims: they argue that Plaintiffs should have known the basis for their trespass bans because the bans were issued shortly after a single act of alleged misconduct—and *not*, in fact, the culmination of a string of past conduct. *See* Defs.' Resp. at 27;

1

PageID.230.

Second, Defendants' repeated reference to Plaintiffs' supposed "criminal conduct" or "pending charges" is misleading and shows as little care as their casual issuance of trespass bans. Defs.' Resp. at 1, 2, 16; PageID.204, 205, 219. *None* of the Plaintiffs have been convicted of *any* crime in relation to the protests at which they received the bans challenged here. And only one Plaintiff in this Motion, Alice Elliott, has even been *charged* with a crime in connection with one of those protests. Charges are not "pending" against the others (even if charges were merely *requested*, none have been filed) and their prior conduct has not been proven to be "criminal" at all. *See, e.g.,* Defs.' Resp. at 6; PageID.209.

Thus, Defendants' legal position must be that it was constitutional for a police officer to ban Plaintiffs from the entire University campus—and, in some cases, all three campuses—for (1) a single act of *alleged* misconduct that (2) has not led to a criminal charge for most, to a criminal conviction for anyone, or to any academic disciplinary penalty or student code-of-conduct violation.

**Jonathan Zou.** Defendants complain of Zou's frequent involvement in on-campus protests. But Zou has never been charged with a crime for his lawful participation in those protests.[1] Ex. A, ¶4. It would be dangerous—unconstitutional,

---

[1] Zou was issued a separate trespass ban from the Ruthven Building in connection with a protest there, but that ban is not being challenged in this lawsuit. Ex. A, ¶14.

2

in fact—to treat his frequent participation in protests, even divisive ones, as evidence of misbehavior or lawlessness, as Defendants suggest. *See* Defs.' Resp., Ex. C, ¶¶15, 20; PageID.289-290; PageID.291-292. As to the protest that *is* at issue here, no criminal charges have been filed against Zou, nor has he even been ticketed under the non-criminal amplified noise ordinance for using a megaphone. Ex. A, ¶2. He has never been charged with any crime in connection with *any* on-campus protest. *Id.* at ¶4. Further, although it does not affect the constitutionality of his ban, Zou denies that any officer tried to "move [him] away from the crowd to address [his] conduct." Defs.' Resp., Ex. C, ¶17; PageID.291. Instead, the officer promptly tackled and arrested him once he resumed use of his megaphone. Ex. A, ¶¶9-13.

**Gabriel Vieira.** There is no criminal case ongoing against Vieira. He was charged in connection with the Ruthven Protest (which is not at issue in this lawsuit), and that charge was recently dismissed in an order of *nolle prosequi*. *See* Ex. B, ¶¶2-4 and Ex. 1 thereto. As to the protest at which he received the ban challenged here, no criminal charges have been filed against him. *Id.*, ¶8. He has never been convicted of any crime or been subject to any university discipline in connection with any on-campus protest. *Id.*, ¶9. Further, although it does not affect the constitutionality of his ban, Vieira promptly exited the street upon an order from a police officer. *Id.*, ¶5. He was nevertheless arrested on the *sidewalk*, underscoring his compliance with the police order. *Id.* This may explain why even Defendants do not contend that

3

charges are "pending" regarding this incident.

**Christian Grant.** Defendants' repeatedly accuse Grant of graffiti, but a careful review of their evidence suggests he stands accused of using *chalk*— an erasable medium. Defs.' Br, Ex. C, ¶ 30. At no point was Grant informed that his ban was for allegedly using chalk, so that allegation could not be addressed in his appeals. Ex. C, ¶2. As of this date, no criminal charges have been filed against him. *Id.*, ¶3. He has never been charged with any crime or been subject to any university discipline in connection with any on-campus protest. *Id.*, ¶4.

**Alice Elliott.** There is an ongoing criminal case related to Ms. Elliott's involvement in the Festifall Protest. Ex. D, ¶2. She is presumed innocent and has not been convicted. At her arraignment, the judge determined that a *narrower* ban was a sufficient bond condition and that she should be permitted to return to work on campus. *Id.*, ¶3. In other words, her trespass ban is broader than her court-ordered bond condition. *Id.*, ¶4. To date, Ms. Elliott has never been convicted of any crime, nor has she been subject to any university discipline, in connection with any on-campus protest, including the years-old events Defendants dredge up in their declarations. *Id.*, ¶6.

II. **The Trespass Bans Are Subject to Heightened First Amendment Scrutiny and Are Not Tailored to Survive any Level of Scrutiny.**

In an effort to enjoy a lower level of scrutiny, Defendants misread *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994), and *Huminski v. Corsones*, 396

4

F.3d 53 (2d Cir. 2005), as applying only to court-ordered injunctions. Defendants contend that the trespass bans are an "application of a general policy," Defs.' Resp. at 15, PageID.218, and thus not discretionary actions subject to heightened scrutiny.

Defendants' argument is unavailing for one simple reason: the very nature of the Trespass Policy is that it confers sweeping discretion on individual police officers. The Trespass Policy lays out broad grounds and processes for issuing a trespass ban. Verified Compl., Ex. B; PageID.66. But the decisions of whether to issue a ban, and its geographic scope, rest entirely in the discretion of individual officers based on their own observations. *See* Defs.' Resp., Ex. C, ¶8; PageID.287 ("UMPD officers determine the scope of a trespass warning"). *Id.*, ¶9; PageID.288 ("UMPD officers often provide exceptions . . . ."). *See also* Verified Compl., Ex. B., ¶2; PageID.66 (delegating discretionary enforcement authority to police officers).

The risk of "singling out of [individuals] for exclusion, thereby permitting all others to engage in similar activity," *Huminski*, 396 F.3d at 92, is why courts apply heightened scrutiny to these types of discretionary restrictions that impact speech, even if some governing policy applies.[2] Unilateral decisions by officers in the field not only "carry greater risks of censorship and discriminatory application than do

---

[2] Defendants are also wrong that Plaintiffs' motion relies on viewpoint discrimination. *See* Defs.' Resp. at 15; PageID.218. While there are serious concerns about the motivation for these bans, *see* Verified Compl., ¶¶66-69, PageID.21, the motion is not predicated on viewpoint discrimination.

general ordinances," *Madsen*, 512 U.S. at 764, they carry greater risks of censorship than injunctions imposed by neutral judges after extensive courtroom hearings.

In fact, *Madsen* itself recognizes that judicial injunctions are often "remedies imposed for violations (or threatened violations) *of a legislative . . . decree*." 512 U.S. at 764 (emphasis added). So, too, here: the trespass bans were individualized "remedies imposed for [alleged] violations (or threatened violations) of" the Trespass Policy. *Madsen* and the case law applying it are, thus, directly applicable. Tellingly, Defendants simply ignore the string of cases Plaintiffs cited that apply *Madsen* or *Huminski* to non-judicial trespass bans. *See* Pls.' Br. at 11, PageID.112.

In any event, the full-campus trespass bans here survive neither *Madsen* nor a lower level of scrutiny. Defendants rely on cases involving bans far more tailored than the one at issue here. *See Wright v. City of St. Petersburg*, No. 8:13-cv-2784, 2014 WL 7273946 (M.D. Fla. Dec. 19, 2014) (trespass ban from a single public park); *Siders v. City of Brandon*, 123 F.4th 293 (5th Cir. 2024) (ordinance regulating a single amphitheater); *Lovern v. Edwards*, 190 F.3d 648 (4th Cir. 1999) (trespass ban from primary and secondary school properties). None of these cases uphold bans from a vast and open urban campus that is also the core of an entire city.

### III. The Trespass Bans Closely Resemble the Unconstitutional Restrictions on Travel in *Johnson v. City of Cincinnati*.

Defendants attempt to avoid the severity of the infringement of Plaintiffs' substantive due process right to travel by framing the bans as "limit[ing] access to

6

specific government property" in ways that merely "inconvenience" Plaintiffs. Defs.' Resp. at 21, PageID.224. This framing badly mischaracterizes the bans. They are not "specific" *at all*: they prohibit Plaintiffs from stepping foot on *any* part of the University's vast Ann Arbor campus—or all three University campuses. The result is not an "inconvenience"; it is a ban from the core of the Ann Arbor community—including walking down the sidewalk or using the municipal bus service or working.

Defendants' reliance on non-binding case law to distinguish *Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002), falls flat. First, Defendants point to *McComas v. Bd. of Educ. Rock Hill Loc. Sch. Dist.*, No. 07-cv-573, 2009 WL 10679743 (S.D. Ohio Nov. 5, 2009), as supposedly refusing to extend *Johnson* to "prohibitions on accessing school property." Defs.' Resp. at 20, PageID.223. But *McComas* involved a student's expulsion from a single high school. The right to travel freely articulated in *Johnson* was not implicated because the student was not "directly or constructively prohibited from traveling through public spaces and roadways within the . . . School District." *McComas*, 2009 WL 10679743 at *15. Here, Plaintiffs *are* prohibited, on threat of criminal penalty, from traversing countless public spaces, visiting a large percentage of Ann Arbor's population (students), and entering the city's leading cultural institutions.

*Does v. Whitmer*, No. 22-cv-10209, 2024 WL 4340707, at *28 (E.D. Mich. Sept. 27, 2024), is also inapposite. *Does* applied to people convicted of crimes and

7

did not categorically ban their travel; it required affected individuals to report their travel plans in advance. Neither circumstance applies here.[3]

Moreover, the right to local travel recognized in *Johnson* "is fundamentally one of access" to a community. 310 F.3d at 495. Plaintiffs are not claiming a right to travel "whenever, wherever, and however" they please. Defs.' Resp. at 21, PageID.224. They are invoking the fundamental right to access central swaths of their community. The trespass bans "broadly prohibit[] individuals to access [an] entire neighborhood." *Johnson*, 310 F.3d at 502. Such a ban could not overcome strict scrutiny in *Johnson*, which involved people arrested for drug crimes, and it does not do so here. The bans are not narrowly tailored to any government interest.

Defendants' admissions underscore their failure to tailor the bans: They claim "UMPD has never arrested for trespass on public streets or sidewalks," Defs.' Resp. at 21-22, PageID.224-225, all but conceding that they have little-to-no interest in enforcing the trespass bans on many public spaces on campus. Nevertheless, the bans prohibit Plaintiffs from stepping foot on such public spaces. Defendants' implication that Plaintiffs should leave themselves "at the mercy of [the government's] *noblesse*

---

[3] Quoting *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746 (7th Cir. 2012), Defendants also claim that Plaintiffs must "'allege[] that the only way to get from one location to another is to traverse school property.'" Defs.' Resp. at 21, PageID.224. But the quoted (non-binding) language is only one example the Seventh Circuit gave to state a claim. Another is that "the ban inhibits [one's] ability to move from place to place within" the affected area. 673 F.3d at 756. That is the case here.

*oblige*," *United States v. Stevens*, 559 U.S. 460, 480 (2010), and hope their sweeping bans are underenforced does not make the bans any less sweeping or untailored.

Finally, Defendants mischaracterize *Kennedy v. City of Cincinnati*, 595 F.3d 327 (6th Cir. 2010), as recognizing only a procedural due process interest. Defs.' Resp. at 19, PageID.222. While *Kennedy* involved a procedural due process *claim*, the key predicate right that entitled Kennedy to adequate process in the first place was a *substantive* due process right to remain in a public place, as evidenced by *Kennedy*'s reliance upon substantive due process caselaw such as *City of Chicago v. Morales*, 527 U.S. 41 (1999). *See Kennedy*, 595 F.3d at 335.[4]

### IV. The Bans Were Imposed Without Procedural Due Process.

Vieira and Elliott did not waive their procedural due process claims by not completing all appeals. "[O]ne need not exhaust state remedies before . . . claiming a violation of procedural due process." *Jefferson v. Jefferson Cnty. Pub. Sch. Sys.*, 360 F.3d 583, 588 (6th Cir. 2004) (cleaned up). One only need demonstrate "*as an element* of that claim that state procedural remedies are inadequate." *Id.* Plaintiffs have done that. Pls.' Mot. at 20-24; Verified Compl., ¶¶167-178.

On the merits, Defendants' own papers reveal the inadequacy of the appeal proceedings in two ways. First, Defendants contend that notice was sufficient

---

[4] Plaintiffs are also not claiming a right to "continuous occupation" akin to Occupy Wall Street protestors. Defs.' Resp. at 19, PageID.222. They are claiming a right to remain temporarily on various public parts of campus.

because the trespass bans were issued "right after . . . arrest[s] for the conduct at issue," so Plaintiffs must have known why they were banned. Defs.' Resp. at 27, PageID.230. That was not true for Christian Grant, who was not arrested and was banned days after the alleged conduct occurred. Defs. Resp, Ex C ¶¶ 29-30. But, regardless, this assertion inverts the *government's* obligation to provide notice, instead requiring *Plaintiffs* to guess what alleged violation gave rise to their bans.

Second, Defendants say that Plaintiffs are just speculating that police supervisors are biased adjudicators of appeals involving trespass bans issued by their direct reports. But Defendants' own declarant admits that he was "instructed" to expand Zou's trespass ban shortly after it was issued. *See* Defs' Br., Ex C ¶ 18. Defendants have subsequently stipulated, in response to an inquiry from undersigned counsel, that this instruction came from Defendant Washington, *see* Ex. E, who presides over second-level appeals and who supervises Defendant James. This admission shows that police supervisors are directly communicating *ex parte* with issuing officers, sometimes even outside of the chain of command. The supervisors are, quite literally, involved in both sides of the process. It is inconsistent with due process when the recipient of a ban's "only recourse [is] to appeal that decision to the same official who originally banned him." *Barton v. City of Ann Arbor*, No. 2:23-cv-11423, 2024 WL 4193751, at *10 (E.D. Mich. Sept. 13, 2024).

/s/ Ramis J. Wadood

10

Respectfully submitted,

Ramis J. Wadood (P85791)  
Philip E. Mayor (P81691)  
Bonsitu Kitaba-Gaviglio (P78822)  
Delaney Barker (P87401)  
Daniel S. Korobkin (P72842)  
American Civil Liberties Union  
   Fund of Michigan  
2966 Woodward Avenue  
Detroit, MI 48201  
(313) 578-6800  
rwadood@aclumich.org  

John C. Philo (P52721)  
Liz Jacob (P86981)  
Anthony D. Paris (P71525)  
SUGAR LAW CENTER  
FOR ECONOMIC & SOCIAL JUSTICE  
4605 Cass Ave., 2nd Floor  
Detroit, MI 48201  
(313) 993-4505/Fax: (313) 887-8470  
jphilo@sugarlaw.org  
ljacob@sugarlaw.org  
tparis@sugarlaw.org  

Amanda M. Ghannam (P83065)  
Jack W. Schulz (P78078)  
Cooperating Attorneys,  
American Civil Liberties Union  
   Fund of Michigan  
645 Griswold St. Suite 4100  
Detroit, MI 48226  
(313) 788-7446  
amanda@michiganworkerlaw.com  
jack@michiganworkerlaw.com  

Attorneys for Plaintiffs

Dated: March 26, 2025

11

## LOCAL RULE CERTIFICATION

I, Ramis Wadood, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

/s/ Ramis J. Wadood (P85791)