**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

JONATHAN ZOU, OLIVER KOZLER, ALICE ELLIOTT, CHRISTIAN GRANT, AND EMILY WALL,

      Plaintiffs,

  v.

DOMENICO GRASSO, in his official capacity as President of the University of Michigan; [1] ROBERT HEWLETT III, in his official capacity as Interim Executive Vice President and Chief Financial Officer of the University of Michigan; [2] RICHARD ARNOLD, in his official capacity as Interim Executive Director of the University of Michigan's Division of Public Safety and Security; [3] and CRYSTAL JAMES, in her official capacity as Chief of Police for the University of Michigan Police Department,

      Defendants.

Case No. 2:25-cv-10315

Hon. Mark A. Goldsmith
Mag. Elizabeth A. Stafford

---

[1] Santa J. Ono no longer serves as president of the University of Michigan. Pursuant to Fed. R. Civ. P. 25(d), the current acting president, Domenico Grasso, is "automatically substituted as a party."

[2] Geoffrey Chatas no longer serves as executive vice president and chief financial officer of the University of Michigan. Pursuant to Fed. R. Civ. P. 25(d), the current interim executive vice president and chief financial officer, Robert Hewlett III, is "automatically substituted as a party."

[3] Eddie Washington no longer serves as executive director of the University of Michigan's Division of Public Safety and Security. Pursuant to Fed. R. Civ. P. 25(d), the current acting director, Richard Arnold, is "automatically substituted as a party."

1

## SECOND AMENDED VERIFIED COMPLAINT

### INTRODUCTORY STATEMENT

1.      The fundamental right to speak and protest without improper government obstruction is at its peak in the public university setting, where "the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835 (1995). That is especially so for speech and protest regarding controversial or divisive issues.

2.      Since the Fall 2023 semester, the University of Michigan ("the University")—like universities across the nation—has seen a surge in on-campus protest activity related to the devastating events in Palestine and Israel. Hundreds, if not thousands, of students and non-student community members have participated in on-campus protests organized to support Palestinians in Gaza, to denounce Israeli policy and military conduct, and to call for the University of Michigan to divest from companies and institutions with ties to Israel.

3.      The University's response to these protests has been harsh, and is escalating. Many of the larger protests have resulted in the University and its police arresting, detaining, physically harming, and using chemical sprays against protestors; initiating a variety of disciplinary proceedings against protestors; ordering protestors not to appear on campus under threat of criminal trespass

sanctions; and adopting a new, ill-defined policy broadly prohibiting "disruptions" anywhere on campus.

4.      The University's aggressive tactics against protestors in support of Palestinian human rights have become a blueprint for the suppression of other disfavored speech—especially speech critical of the University.

5.      In particular, the University has since employed similar tactics against community members protesting the University's partnership with Los Alamos National Laboratory to build a $1.2 billion supercomputing/artificial intelligence data center in Ypsilanti Township, Michigan—most notably at a recent University presentation about the data center.

6.      Plaintiffs are among the many student and non-student protestors who have been subjected to the University's heavy-handed response. This lawsuit focuses on the fact that each has been banned from the entire University of Michigan Ann Arbor campus—and most from all three of the University's campuses—after having participated in a recent protest on campus.[4] These trespass bans have upended Plaintiffs' daily lives, disrupted their education and work, and are blocking their ability to speak and protest freely on the University's vast campus.

---

[4] Although Plaintiffs Jonathan Zou, Oliver Kozler, Christian Grant, and Emily Wall have also been banned from the University of Michigan's Flint and Dearborn campuses, references to "campus" in this Complaint are about the Ann Arbor campus unless otherwise stated.

7.      The University's use of trespass bans seems to be disproportionately targeted at these particular protestors, whose speech the University dislikes. Despite a long history of protest activity regarding countless issues at the University of Michigan, which has sometimes included acts of civil disobedience, it appears that past groups of protestors were not subjected to similarly broad trespass bans for the same or similar alleged activity under earlier university administrations.

8.      This lawsuit also challenges the recently adopted University policy prohibiting, with sweeping breadth, on-campus "disruptions." Plaintiffs fear that the policy, by failing to define what activity constitutes a "disruption," will subject them to further punitive actions if they are allowed to return to campus. The overly broad and vague nature of this policy is thereby chilling and repressing Plaintiffs' rights to exercise their free speech and protest.

9.      Plaintiffs bring this action under 42 U.S.C. § 1983 to vindicate their free speech, substantive due process, and procedural due process rights, to enjoin Defendants from issuing and enforcing trespass bans such as the ones at issue here, and to enjoin the new anti-disruption policy. Plaintiffs wish to return to their daily lives and to the time-honored tradition of passionate on-campus political activism— a tradition with which Defendants are unduly interfering.

## JURISDICTION AND VENUE

10.     Because this civil rights action arises under the United States Constitution, this Court has jurisdiction under Article III of the U.S. Constitution and under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

11.     Venue is proper under 28 U.S.C. § 1391(e) because the incidents, events, and occurrences giving rise to this action occurred in the Eastern District of Michigan and because all Parties are domiciled in the Eastern District of Michigan.

12.     This Court is authorized to award the requested declaratory and injunctive relief under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201-2202, and the Court's equitable powers.

## PARTIES [5]

13.     **Plaintiff Jonathan Zou** is a third-year undergraduate student enrolled in the University of Michigan's College of Engineering. He resides in Ann Arbor, Michigan.

14.     In the months preceding his trespass ban, Mr. Zou attended protests and other gatherings in support of Palestine on campus.

15.     Defendants issued Mr. Zou a trespass ban fully covering the University of Michigan's Ann Arbor, Flint, and Dearborn campuses on October 7, 2024, after

---

[5] Declarations from Plaintiffs verifying the facts in this complaint are attached as Exhibit A.

he participated in a march that took place on and around "the Diag," the University's primary central outdoor gathering space. His trespass ban expired on October 7, 2025.

16. **Plaintiff Oliver Kozler** is a recent (spring 2025) graduate of Michigan's College of Literature, Science, and the Arts. Mr. Kozler was the assistant general manager of WCBN-FM, the University's student-run radio station that operates out of the Student Activities Building on campus. He resides in Ann Arbor, Michigan.

17. In the months preceding his trespass ban, Mr. Kozler was an undergraduate at the University and attended protests and other gatherings in support of Palestine on campus.

18. Defendants issued Mr. Kozler a trespass ban fully covering the University's Ann Arbor, Flint, and Dearborn campuses on May 21, 2024, after he participated in a pro-Palestine student encampment on the Diag. With the exception of being allowed to go to class, fulfill work obligations (such as managing the student radio station), and seek care at the University medical center, he was banned from stepping foot on all three university campuses. His trespass ban expired on May 21, 2025.

19.    **Plaintiff Alice Elliott** is a 2018 master's graduate of the University of Michigan's School for Environment and Sustainability. She resides in Ypsilanti, Michigan.

20.    She currently works as an emergency medical technician (EMT) through a company that operates ambulances throughout Southeast Michigan, including occasionally Ann Arbor.

21.    Since graduating, Ms. Elliott has maintained relationships at the University and, until being banned, frequently visited campus for a variety of reasons, such as seeing family and friends, using university libraries, and attending events and protests.

22.    In the months preceding her trespass ban, Ms. Elliott attended on-campus protests in support of Palestine that were advertised to the public on social media.

23.    Defendants issued her a full-campus trespass ban after she participated in an August 28, 2024 pro-Palestine protest on the Diag. Her trespass ban expired on August 28, 2025..

24.    **Plaintiff Christian Grant** is a resident of Ypsilanti, Michigan. He is frequently on campus to complete food deliveries requested via DoorDash and to visit friends and acquaintances who are affiliated with the University.

7

25. Since at least April 2024, Mr. Grant had visited campus to participate in pro-Palestine protests that were advertised to the public, as well as gatherings relating to other social justice issues. He has also been invited by various student organizations to either participate in or help organize protests, community meetings, and other gatherings on campus.

26. Defendants issued Mr. Grant a full-campus trespass ban on September 24, 2024, after he participated in a march through campus opposing Israeli military action in southern Lebanon. That trespass ban expired on September 24, 2025.

27. Defendants issued Mr. Grant a second trespass ban covering the University of Michigan's Ann Arbor, Flint, and Dearborn campuses on October 22, 2025, after Mr. Grant participated in a protest opposing former Israeli military members who were on campus for an event. With the exception of being allowed to seek care at the University medical center, he remains banned from the University's Ann Arbor, Dearborn, and Flint campuses.

28. **Plaintiff Emily Wall** is a 2022 graduate of the University of Michigan, having earned a bachelor's degree in data science. Since graduating, they continue to reside in Ypsilanti, Michigan. [6]

---

[6] Plaintiff Wall prefers they/them pronouns. Accordingly, this Amended Complaint refers to Plaintiff Wall with they/them pronouns and occasionally as "Mx. Wall."

29.     Defendants issued Mx. Wall a full campus trespass ban on May 29, 2025, after they participated in a political demonstration at a presentation on campus about the construction of a data center by the University of Michigan and Los Alamos National Laboratory in Ypsilanti Township, Michigan. With the exception of being allowed to seek care at the University medical center, they remain banned from the University's Ann Arbor, Dearborn, and Flint campuses.

30.

31.     **Defendant Domenico Grasso** is the President of the University of Michigan. He is sued in his official capacity.  At the time of many of the events at the heart of this lawsuit, Santa Ono was the President of the University of Michigan. Pursuant to Fed. R. Civ. P. 25(d), President Grasso is automatically substituted in his place.

32.     Defendant Grasso is "the principal executive officer" of the University of Michigan, Mich. Const. art. VIII  § 6, responsible for "general oversight of the teaching and research programs; the libraries, museums, and other supporting services; the general welfare of the faculty and supporting staff; the business and financial welfare of the University; and the maintenance of health, diligence, and order among the students," along with directing inferior executive officers. *The Bylaws of the University of Michigan Board of Regents* § 2.01, *available at* https://regents.umich.edu/files/meetings/01-01/bylawsrevisedDEC2024.pdf.

33.     **Defendant Robert Hewlett III** is the Interim Executive Vice President and Chief Financial Officer of the University of Michigan. He is sued in his official capacity. At the time of many of the events at the heart of this lawsuit, Geoffrey Chatas was the Executive Vice President and Chief Financial Officer of the University of Michigan.  Pursuant to Fed. R. Civ. P. 25(d), Interim Executive Vice President Hewlett is automatically substituted in his place.

34.     Defendant Hewlett has been delegated the "general authority and supervision" over the use of facilities on campus. Defendant Hewlett "establishes the overarching facilities policy framework" for the University of Michigan. U-M Standard Practice Guide ("SPG") 601.41, *available at* https://spg.umich.edu/policy/601.41.

35.     **Defendant Richard Arnold** is the Interim Executive Director of the University of Michigan Division of Public Safety and Security. He is sued in his official capacity. At the time of many of the events at the heart of this lawsuit, Eddie Washington was Executive Director of the University of Michigan Division of Public Safety and Security.  Pursuant to Fed. R. Civ. P. 25(d), Interim Executive Director Arnold is automatically substituted in his place.

36.     Defendant Arnold manages the various units of the Division of Public Safety and Security, which includes the University of Michigan Police Department, whose officers issued each trespass ban at issue in this lawsuit. He is the presiding

10

decisionmaker at the second stage of appeal of all trespass bans issued by the University of Michigan Police Department.

37. **Defendant Crystal James** is the Chief of the University of Michigan Police Department, which is an agency housed within the University of Michigan Division of Public Safety and Security. She is sued in her official capacity.

38. Defendant James is responsible for managing and supervising the University of Michigan Police Department and its employed officers. She is the presiding decisionmaker at the first stage of appeal of trespass bans issued by the University of Michigan Police Department, whose officers issued each trespass ban at issue in this lawsuit.

## BACKGROUND AND FACTUAL ALLEGATIONS

### The University of Michigan's Ann Arbor Campus

39. The University's primary campus is located in Ann Arbor, Michigan. Unlike many university campuses that are gated and isolated from their host city, the University's Ann Arbor campus is deeply integrated within the City of Ann Arbor's urban grid. Campus sidewalks and streets continue seamlessly into municipal areas, and University-owned buildings sit side-by-side with privately- and other publicly-owned properties. Given the extent to which the University of Michigan's Ann

11

Arbor campus is integrated within the City of Ann Arbor's urban grid, it is virtually impossible to distinguish between campus and city property in some areas.

40.     Civic life on campus reflects the seamlessly embedded nature of the University: every day, Ann Arbor residents traverse campus in order to go to work, return home, buy groceries, visit restaurants and shops, attend events, and carry on with other essential aspects of daily life. And likewise, University-affiliated community members constantly weave in and out of municipal property for the same reasons. In fact, given that some municipal services like bus stops are actually on campus, traversing campus property is arguably *necessary* in order to navigate Ann Arbor.

41.     Many, if not most, of Ann Arbor's defining cultural institutions and public spaces are also on campus. The campus features several theatres and similar cultural institutions where leading performing arts performances occur. Multiple museums, including a natural history museum and an art museum, are part of campus. Local community members, whether or not they are affiliated with the University, frequent these institutions.

42.     The University's open spaces, such as the Diag, are no different. Members of the general public have traditionally had broad access to University-owned green space for a host of recreational and educational purposes. Local residents often visit, relax, and innocently loiter in open spaces like the Diag. They

12

also regularly attend events and protests in those same spaces. Indeed, on-campus protests have historically attracted local residents who are unaffiliated with the University but who, because of how integrated the University is, nonetheless have a stake in the University's actions.

**The University of Michigan's Trespass Ban Regime**

43. The Division of Public Safety and Security ("DPSS") maintains a policy (hereinafter the "Trespass Policy," attached hereto as Exhibit B) purportedly authorizing University of Michigan Police Department ("UMPD") officers to enforce the State of Michigan's trespass statute, M.C.L. § 750.552, on behalf of the University. It does so by authorizing officers to issue a document which it euphemistically describes as a "warning" (hereinafter a "trespass ban"), but which effectively prohibits individuals "from entering or remaining on property owned or leased by the University." Trespass Policy § 1. University property includes, for example, University buildings, parks and open spaces where members of the general public regularly assemble (such as the Diag), and on-campus sidewalks and roads that members of the general public traverse daily.

44. The Trespass Policy authorizes UMPD officers to unilaterally issue a trespass ban on their own accord for any one (or more) of four reasons: "if an individual:

13

(1) Committed or is suspected of committing a crime against persons or property while on campus;

(2) Refused or failed to comply with established University rules that protect the health and safety of persons or property;

(3) Disrupted lawful operations and functions of the University; or

(4) Demonstrated a risk of physical harm or injury to others or property."

*Id.* at § 4.A.

45.    An officer does not need to seek advance permission from anyone before issuing a trespass ban and is not required to explain the basis for the ban to the recipient or anyone else, aside from noting one or more of the four reasons stated above. For example, trespass bans are often issued indicating that the recipient is suspected of unspecified criminal activity, even though the individual is not, in fact, charged with any crime or was not even detained or arrested in connection with a criminal investigation.

46.    The Trespass Policy is not intended to apply with equal force to faculty, students, and staff of the University as it does to unaffiliated community members. The Trespass Policy states that a trespass ban may only be issued to faculty, students, and staff "in extenuating circumstances (e.g., posing an *immediate* threat to the

safety of others),'" and that UMPD officers have multiple alternatives to issuing them a trespass ban. *Id.* at § 4.B (emphasis added).

47. Per the Trespass Policy, all trespass bans last for one year from issuance. *Id.* at § 4.E.

48. In practice, UMPD officers issuing a trespass ban utilize a template form (hereinafter a "trespass form") to inform individuals of the ban.

49. The trespass form requires the issuing officer to designate (1) the reason(s) that the individual is being issued the trespass ban (quoting the four reasons in the Trespass Policy), (2) the geographic scope of the ban, and (3) the recipient's contact information. The back of the trespass form contains the ban's duration (one year), a single *per se* exemption (seeking care at the medical center), and details about appealing the ban. A partially redacted example of a completed trespass form follows:

15

## UNIVERSITY OF MICHIGAN TRESPASS WARNING

Revised 2/2020

I, _Brent Carraway_, under authority granted to me by the President of the University of Michigan, now direct you to immediately leave the location described below. Your failure to do so subjects you to arrest and prosecution for violation of the Michigan Trespass Statute.

**REASON FOR WARNING**
This warning is being issued to you because you: (check all that apply)
- ☑ Committed, or are suspected of committing, a crime while on campus against persons or property;
- ☐ Refused or failed to comply with established University rules that protect the health and safety of persons or property;
- ☐ Disrupted the operations and lawful functions of the University; or
- ☐ Demonstrated a risk of physical harm or injury to others or damage to property.

**SCOPE OF WARNING**
You also are informed that any future entry into the following areas will subject you to arrest for trespassing:
- ☐ The following location(s): _____
- ☑ Any land and any building owned or leased by the University of Michigan _ONLY TO CLASS_

This warning applies to: (check all that apply)
- ☑ Ann Arbor Campus  ☐ Flint Campus  ☐ Dearborn Campus  ☐ Other Location _____

Issued to: ~~█████████~~

Drivers License or ID #: ~~█████████~~          DOB: ~~█████████~~

Address: ~~█████████~~          State: ____

Phone: ~~█████████~~          E-mail: ~~█████████~~

Time/Date: _10/7/24   1805_          Report #: _24 - 5795_

Issuing Officer: _Carraway_

Issuing Department: _UMPD_          Campus: _Ann Arbor_

Original: Issued to Person Warned      Copy: Department Files      Supervisor Reviewed _____

*(Front of Trespass Form)*

**DURATION OF WARNING**
This warning is in effect for one (1) year from today's date, unless extended for cause.

**HEALTH SYSTEM**
You may seek medical care at the University of Michigan Health System without violating this warning, unless this trespass warning indicates otherwise.

**TRESPASS LAW**
The Michigan Trespass Statute (MCL 750.552) reads in part as follows:
"Any person who shall willfully enter upon the lands or premises of another without lawful authority, after having been forbidden to do so by the owner ..., or any person being upon the land or premises of another, upon being notified to depart therefrom by the owner ..., who without lawful authority neglects or refuses to depart therefrom, shall be guilty of a misdemeanor."

**RIGHT TO OBJECT (Step One)**
You have the right to object to the issuance of this warning. The first step to the objection is to request a Trespass Formal Hearing by completing a Trespass Formal Hearing Request Form. You may access the Trespass Formal Hearing Request Form at dpss.umich.edu/trespass. You may complete and submit the form online at dpss.umich.edu/trespass or email to dpss-trespass-appeal@umich.edu or U.S. mail to the issuing department (addresses available at dpss.umich.edu/trespass). Upon receipt of the formal hearing request, the issuing department will contact the petitioners within 14 days to confirm the date, time, and location of the hearing. Questions should be directed to (734) 763-1131.

**RIGHT TO APPEAL (Step Two)**
The recipient of a trespass warning may appeal the outcome of a formal hearing if the individual can demonstrate a change in circumstances. To appeal the outcome of a formal hearing, the Trespass Appeal Request Form must be submitted within 21 days of the date of the letter notifying the petitioner of the formal hearing outcome. The Trespass Appeal Request Form is available at dpss.umich.edu/trespass. You may be complete and submit the form online at dpss.umich.edu/trespass or email to dpss-trespass-appeal@umich.edu or U.S. mail to the DPSS Executive Director, Trespass Appeals, 109 E. Madison, Ann Arbor, Michigan 48109. Questions should be directed to (734) 763-1131.

*(Back of Trespass Form)*

16

50.     Although the University describes this practice as issuing a "trespass warning," in practice and in fact it immediately bans the recipient from all or parts of campus for one year under threat that violating the ban and returning to campus would subject them to arrest and criminal prosecution for trespassing. Trespass Policy at § 6.

51.     Recipients have two chances to challenge a trespass ban, but only after it is issued. First, within seven days of being issued a trespass ban, the recipient may "object" to the trespass ban and request a formal hearing. *Id.* at § 8. Although a formal hearing is requested, the University may or may not respond to the recipient's request. If it occurs, the so-called formal hearing is presided over by the director of the department that issued the trespass ban. *Id.* In the case of trespass bans issued by the UMPD, the department director is the Chief of Police, Defendant Crystal James. It may be conducted either in person or virtually (e.g., via telephone).

52.     The hearing is summary in nature and carried out without published rules or procedures.  Neither the University nor the issuing officer is required to (and typically does not) provide the recipient with the evidence against them, nor are they even required to explain what evidence may exist.

53.     The recipient has no right to question anyone about the basis for the ban and, in fact, is typically scolded if they attempt to do so and told something akin to "the purpose of this hearing is not to tell you what evidence we have against you."

17

Recipients are often accused in vague or unsubstantiated ways of having committed a crime or told that they are under investigation. The only "defense" permitted is that the recipient of the trespass ban is merely asked to explain why their trespass ban should be adjusted—again, typically without being fully aware of what evidence supports the ban in the first place. Such a lopsided hearing appears to be designed to encourage the recipient to incriminate themselves—i.e., wherein apologizing, promising not to violate campus rules in future, or otherwise defending themselves simply to get the ban lifted (and without regard to whether any wrongful conduct actually occurred) may be used by the adjudicating agency (i.e., UMPD) or the University against the individual in future criminal prosecutions or in campus disciplinary actions.

54. Defendant James is required to notify the trespass ban recipient of the results of the hearing within fourteen days. *Id.* at § 8.C.1.

55. If Defendant James upholds the trespass ban, the recipient has the opportunity for an appeal to Defendant DPSS Interim Executive Director Richard Arnold—but only if the recipient can "demonstrate a change in circumstances." *Id.* at § 9. An appeal to Defendant Arnold is timely within twenty-one days of the date the hearing before Defendant James was held. *Id.* at § 9.A.

56. If accepted by Defendant Arnold, an appeal triggers an in-person hearing. *Id.* at § 9.B.(2). Here, too, the hearing is entirely one-sided: the appellant is

expected to explain why their trespass ban should be modified or rescinded. For example, former DPSS Director Washington, like Defendant James before him, did not explain why the appellant was issued the trespass ban or provide any evidence supporting the ban. *See also id.*

57.     Within twenty-one days of the hearing, Defendant Arnold is required to notify the appellant whether he is upholding, modifying, or rescinding the trespass ban. *Id.* at § 9.C.(1). Defendant Arnold's decision is final and unappealable. *Id.* at § 9.C.(2).

**The Recent Surge in Campus Protests and Defendants' Response to Them**

58.     As one of the nation's premier public universities, the University of Michigan has a long history of being a site for political activism and protest. For decades, students and non-student community members have organized countless on-campus protests supporting racial justice,[7] raising awareness about sexual misconduct,[8] and opposing wars,[9] among many other issues.

---

[7] *Activism*, The University of Michigan Library, https://apps.lib.umich.edu/online-exhibits/exhibits/show/history-of-race-at-um/diversity-in-student-life/activism.

[8] Samuel Dodge, *Students to Protest how University of Michigan Handles Sexual Misconduct Cases*, MLive, Nov. 18, 2021, https://www.mlive.com/news/ann-arbor/2021/11/students-to-protest-how-university-of-michigan-handles-sexual-misconduct-cases.html.

[9] *Resistance and Revolution: the Anti-Vietnam War Movement at the University of Michigan, 1965-1972*, Michigan In the World, https://michiganintheworld.history.lsa.umich.edu/antivietnamwar.

59. Since the Fall 2023 semester, many campus protests have focused on Palestine and Israel. On the University's Ann Arbor campus, students and student groups have organized many protests to support Palestinians in Gaza, criticize the policies and military actions of the State of Israel, and to call for the University to divest from companies with ties to Israel or boycott Israeli institutions.

60. Others have organized pro-Israel protests, expressive gatherings in support of Israelis taken hostage or killed by Hamas, and demonstrations to raise awareness about antisemitism on campus.

61. Many of the pro-Palestine demonstrations since the Fall 2023 semester have drawn large crowds of supporters and counter-protestors, including students and non-student community members. Many of these protests have been met with heavy-handed police responses, with University and local police arresting participants, physically harming some, and spraying others with chemicals, among other tactics.

62. One of the earliest pro-Palestine protests on campus was a November 17, 2023 protest at the Ruthven Administration Building (the "Ruthven Protest").[10]

---

[10] Eilene Koo and Astrid Code, *40 Arrested Following Protest and Sit-In at Ruthven Against University Support for Israel*, The Michigan Daily, Nov. 17, 2023, https://www.michigandaily.com/news/administration/students-protest-universitys-support-for-israel-hold-sit-in-at-ruthven.

The protest began in a public space outside the Ruthven building, and a subset of protestors eventually entered the building and staged a sit-in.

63. The police response to the Ruthven Protest involved over twenty-five police vehicles from at least nine police departments, including UMPD and the Ann Arbor Police Department. By the end of the night, police had arrested forty protestors and issued many of them trespass bans, prohibiting them from returning to the Ruthven building for one year.

64. Another on-campus protest was a month-long encampment on the Diag from April 22, 2024 until May 21, 2024 (the "Diag Encampment").[11]

65. The University took no direct police action against students at the Diag Encampment for nearly a month. On May 21, 2024, however, UMPD officers raided the encampment to dismantle it and disperse participants. Officers utilized riot gear, batons, shields, and pepper spray against participants present at the encampment during the raid. Four protestors were arrested during the raid, including Plaintiff Kozler. Any and all criminal charges against Plaintiff Kozler relating to this event were subsequently dismissed by the Attorney General.

66. Protests have continued during the 2024-2025 academic year. On August 28, 2024, a "die-in" demonstration occurred on the Diag during a University-

---

[11] *24 Hours at the Umich Gaza Solidarity Encampment*, The Michigan Daily, Apr. 24, 2024, https://www.michigandaily.com/news/administration/24-hours-at-the-umich-gaza-solidarity-encampment.

sponsored student organization fair called Festifall (the "Festifall Protest").[12] The die-in involved participants lying on the ground, as if dead, in an attempt to illustrate civilian casualties of war.

67. Roughly one hour into the Festifall Protest, UMPD officers ordered participants to disperse. Most protestors dispersed, but police officers nonetheless arrested four individuals, including Plaintiff Elliott, who was attempting to offer medical assistance to another arrested protestor. Any and all criminal charges against Plaintiff Elliott relating to this event were subsequently dismissed by the Attorney General.

68. On October 7, 2024, another pro-Palestine demonstration occurred, this time in the form of a march through campus to remember Palestinians in Gaza who had been killed in Israeli military attacks over the past year (the "October 7 March").[13] The march occurred at the same time as a vigil in the Diag recognizing

---

[12] Abigail VanderMolen and Emma Spring, *4 Arrested During Pro-Palestinain 'Die-In' Demonstration at Festifall, Marking First TAHRIR Coalition Protest of 2024 School Year*, The Michigan Daily, Aug. 29, 2024, https://www.michigandaily.com/news/administration/4-arrested-during-pro-palestine-die-in-demonstration-at-festifall-marking-first-tahrir-coalition-protest-of-2024-school-year.

[13] Jon King, *Protesters Clash with U of M Police During Demonstration on Anniversary of Oct. 7 Hamas Attack,* Michigan Advance, Oct. 7, 2024, https://michiganadvance.com/2024/10/07/protesters-clash-with-u-of-m-police-during-demonstration-on-anniversary-of-oct-7-hamas-attack.

the anniversary of Hamas's attack on Israel resulting in the killing and kidnapping of over 1,000 Israelis.

69. The October 7 March began in front of Rackham Auditorium and proceeded towards the Diag. The march continued without incident until it circled around the Diag and reached the Kinesiology Building. There, a UMPD police officer arrested Plaintiff Zou, who was using a megaphone. Zou did not resist, but his arrest led to uproar from other protestors. Police responded to those protestors with physical force and pepper spray. No criminal charges have ever been filed against Plaintiff Zou in connection with this event.

70. Throughout all these protests and others, a common police tactic emerged: the liberal issuance of trespass bans to protestors who, according to the issuing UMPD officer, allegedly violated university policy, engaged in a "disruption," or were accused of having committed a crime on campus.

71. The UMPD has never informed protestors of any exigent circumstances for the issuance of their trespass bans, and no such circumstances exist.

72. UMPD officers issued trespass bans to protestors after many pro-Palestine protests on campus, including but not limited to the Ruthven Protest, the Diag Encampment, the Festifall Protest, and the October 7 March.

73. Furthermore, it appears that UMPD officers initially issued broad trespass bans exclusively to pro-Palestine protestors; they are not believed to have

issued trespass bans of similarly broad scope to any other protestors in approximately the first 18 months following the beginning of the Fall 2023 on-campus protest movement in support of Palestinian human rights.

74. The early use of trespass bans against protestors was somewhat limited in scope; for example, numerous participants in the Ruthven Protest were banned only from the Ruthven Administration Building (albeit for a full year).

75. But UMPD officers' issuance of trespass bans quickly evolved to become more expansive. When students staged protests at various graduation ceremonies in April and May 2024, for example, some of them were banned not only from the building in which that ceremony took place, but from *all* campus buildings in which graduation ceremonies take place for a year, regardless of whether a ceremony was actually being held. The facilities encompassed by such bans include major campus auditoriums and "the Big House," where the University football team plays.

76. Similarly, some participants in the Diag Encampment were banned from an entire swath of campus that included not only the space at the heart of the Diag (where the Encampment took place) but dozens of classrooms, administrative buildings, and outdoor spaces such as bus stops that surround the Diag. A few participants in the Encampment, including Mr. Kozler, even received full-campus bans.

77.     UMPD officers soon began to issue protestors full-campus bans more frequently, even though the underlying protests or the alleged underlying conduct supporting the bans did not show any corresponding expansion or intensification. In connection with the Festifall Protest and the October 7 March, more protestors, including students, were issued full-campus—or even multi-campus—trespass bans.

78.     The University has since adapted this alarming strategy of issuing protesters full-campus bans to repress other protest movements critical of the University on the Ann Arbor campus.

79.     As the pro-Palestine movement was growing and gaining support on campus, another protest movement relating to the University was burgeoning.  For months, community members have spoken out in opposition to the University's partnership with Los Alamos National Laboratory to build an artificial intelligence data center in Ypsilanti Township, Michigan, focused on surveillance and national security. Opponents of the data center are deeply concerned that the project requires massive energy and water consumption, potentially bringing a strain to municipal utilities and negatively impacting the Huron River ecosystem; that the project will further enmesh the University (and thus the State of Michigan) in a military-industrial partnership; and that the resulting research and data center itself would subject countless people to increased government surveillance.

80. During a May 29, 2025 on-campus presentation about the data center project, a number of protestors staged a demonstration in opposition to the data center's construction. The University, using its full-campus trespass ban blueprint, issued sweeping multi-campus bans to at least three of those protesters, including Plaintiff Wall.

81. Furthermore, the University's recent practices show that it often does not allow trespass bans to expire after a year and instead treats them as presumptively renewable. On November 15, 2024, two days before the bans for protestors who participated in the Ruthven Protest on November 17, 2023 were set to expire, the University emailed a large number of the trespass ban recipients a form letter stating:

> "On November 17, 2023, you were issued a Trespass Warning prohibiting entry to the Alexander G. Ruthven Building . . . . After reviewing your trespass case, we have determined that you are not eligible to have your Trespass Warning lifted. You are prohibited from entering the Alexander G. Ruthven Building until November 17, 2025, at which time the University of Michigan Police Department Chief of Police will review your status."

This form letter did not include any written justification for the extension of the ban, instead simply expanding its temporal scope for another year (effectively a second trespass ban for alleged conduct from a year prior).

26

**Defendants' Wielding of Trespass Bans Against Plaintiffs**

82. Plaintiffs are among the many recipients of trespass bans issued to protestors. Defendants issued each Plaintiff a full-campus trespass ban after they participated in an on-campus protest.

83. ***Plaintiff Jonathan Zou.*** Mr. Zou attended the October 7 March. He acted as a protest marshal, helping to lead the protest attendees in marching around campus and chanting slogans.

84. As he marched, he used a megaphone to instruct the crowd on what slogans to chant. Near the end of the march, after having used the megaphone without issue for roughly forty-five minutes, Mr. Zou was confronted by a UMPD officer. The officer informed Mr. Zou that he could not use a megaphone and instructed him to put the megaphone away. Mr. Zou promptly lowered the megaphone and jogged forward to continue marching.

85. About ten meters ahead, Mr. Zou raised the megaphone again to resume chanting. After Mr. Zou's resumed use of the megaphone, the same UMPD officer rushed towards Mr. Zou, forcefully grabbed him, pushed him towards a nearby tree, wrestled him to the ground, and handcuffed him.

86. After arresting Mr. Zou, the officer escorted him to a nearby UMPD police car. The officer transported Mr. Zou to the DPSS headquarters, where his

photograph and fingerprints were taken. After being booked, Mr. Zou was informed that he was being released from UMPD custody.

87. Upon Mr. Zou's release, UMPD officer Brent Carriveau handed him a filled-out trespass form and asked him whether he understood the form's contents. Mr. Zou reviewed the form, confirmed that he understood its contents, and left the DPSS station. *See* Zou Trespass Form, attached hereto as Exhibit C.

88. The trespass form that Mr. Zou received at the station stated that he was being issued a trespass ban because he "Committed, or [was] suspected of committing, a crime while on campus against persons or property." *Id.* The form further stated that he was banned from "Any land and any building owned or leased by the University of Michigan . . . Ann Arbor Campus," with a handwritten exception that he could go "ONLY TO CLASS." *Id.* The ban was effective immediately, lasting for a period of one year (i.e., until October 7, 2025).

89. On October 8, 2024—one day after being banned from campus—Mr. Zou received an email from UMPD Deputy Chief Paul DeRidder stating that his trespass ban "has been amended to include all of the Ann Arbor campus, Flint and Dearborn. You cannot attend class in person." In other words, Mr. Zou was now banned from *all* University campuses for *all* reasons. *See* DeRidder Email, attached hereto as Exhibit D. All of Mr. Zou's classes at the time were held only in person, meaning that he had no option to attend his classes remotely. DeRidder issued the

28

expanded trespass ban under express instructions from former DPSS Executive Director Washington, despite the fact that Washington was supposed to serve as the ultimate arbiter of any appeals of trespass bans.

90.     Because of the amended trespass ban, Mr. Zou was prohibited from attending classes, office hours, student organization meetings, protests, and any other event or gathering on any of the University's campuses. He was also barred from accessing any of the University's dining halls, for which he has an unlimited meal plan that he relied on for the majority of his meals. He was also barred from using the University's recreational sports facilities that are included in the tuition and fees for all enrolled students.

91.     Mr. Zou timely filed an objection to his trespass ban on or around October 11.

92.     The filing of the objection triggered what the University described as a "formal hearing," which was held on October 14. The hearing was in person and included Mr. Zou, his attorney, a faculty member supporting Mr. Zou, and Defendant Police Chief Crystal James.

93.     At the hearing, Defendant James refused to explain why Mr. Zou received a trespass ban or present any evidence supporting the trespass ban. Instead, Defendant James asked Mr. Zou why she should modify his ban. Mr. Zou explained his need to go to class, and Mr. Zou's attorney offered to send Defendant James a

29

list of his classes. Defendant James said that she would let them know if she needed the list.

94. Instead of following up to obtain the list of Mr. Zou's classes, Defendant James emailed Mr. Zou a letter on October 21 informing him that she was rejecting his request and upholding his ban in full. She did not provide any reasoning for, or evidence supporting, her decision. Zou Objection Denial Letter, attached hereto as Exhibit E.

95. Mr. Zou further appealed Defendant James's denial, this time to former DPSS Executive Director Eddie Washington. An appeal hearing was held on November 1, 2024—by which point Mr. Zou had missed nearly a month of classes and countless other social and educational experiences. The hearing included Mr. Zou, his attorney, and former DPSS Executive Director Washington. At that hearing, Director Washington informed Mr. Zou that he would modify his trespass ban so that he could go to class, but *only* if Mr. Zou promised that he would not violate the law when on campus. Mr. Zou obliged, promising not to break the law on campus.

96. Later that day, Mr. Zou received a letter from former DPSS Executive Director Washington informing him that DPSS has "agreed to amend the terms of your Trespass Warning. Effective immediately, you are permitted limited access to campus facilities solely for activities required to fulfill your degree program's academic obligations. This encompasses attending scheduled classes, labs,

30

internships, student employment, or other responsibilities directly supporting your coursework." However, the letter emphasized that "any campus presence beyond these specified academic purposes will be deemed a violation of this revised agreement." Zou Appeal Decision Letter, attached hereto as Exhibit F.

97.    Once Mr. Zou's trespass ban was amended, he returned to attending classes in person. While his ban was in place, Mr. Zou was banned from all University of Michigan campuses for all reasons other than those stated directly above, including attendance at protests, student organization meetings, and other expressive gatherings, as well as access to the dining halls and campus recreational facilities that are included in the tuition and fees for all enrolled students.  However, it remained unclear whether he would have been subject to arrest and prosecution for activities such as going to an on-campus library to check out a book or meeting a study group in a University building.

98.    Mr. Zou's trespass ban eventually expired on October 7, 2025.

99.    ***Plaintiff Oliver Kozler***. Mr. Kozler was an active participant in the Diag Encampment.

100.   Mr. Kozler was among the participants present at the Diag Encampment when police officers raided and dismantled it. He was arrested by UMPD during the raid, detained in the Diag, and was transferred to a holding cell before being released later that day.

101.   While detained in the Diag, UMPD Officer Yencer handed him a filled-out trespass form and asked him whether he understood the form's contents. Mr. Kozler reviewed the form and confirmed that he understood its contents. *See* Kozler Trespass Form, attached hereto as Exhibit G.

102.   The trespass form that Mr. Kozler received stated that he was being issued a trespass ban because he "[c]ommitted, or [was] suspected of committing, a crime while on campus against persons or property," "[r]efused or failed to comply with established University rules that protect the health and safety of persons or property," and "[d]isrupted the operations and lawful functions of the University." *Id.* The form further stated that he was banned from "[a]ny land and any building owned or leased by the University of Michigan . . . Ann Arbor Campus, Flint Campus, and Dearborn campus." *Id.* The ban was effective immediately, lasting for a period of one year (i.e., until May 21, 2025).

103.   Because of the trespass ban, Mr. Kozler was prohibited from attending classes, office hours, student organization meetings, protests, and any other event or gathering on any of the University's campuses. He was also blocked from managing the student-run radio station, for which he has been the assistant general manager since May 2024 and an executive board member since the summer of 2023. He was also barred from accessing University recreational facilities that are included in the tuition and fees for all enrolled students.

104. After an appeal, Mr. Kozler's multi-campus ban was eventually amended to allow him only to attend classes and fulfill work obligations, which at the time was at the campus radio station. But during the summer of 2024, prior to this modification, Mr. Kozler was unable to go to the radio station in person and therefore unable to work his shift as a deejay at the radio station. Mr. Kozler often uses his shift as an opportunity to discuss issues relating to Palestine on-air, and his ban during the summer of 2024 directly intruded upon his ability to do so.

105. Once Mr. Kozler's trespass ban was amended, he was able to attend classes in person and to manage the campus radio station from its on-campus office without running afoul of the ban. While his ban was in place, Mr. Kozler was banned from all University of Michigan campuses for all reasons other than those stated directly above, including attendance at protests, student organization meetings, and other expressive gatherings, as well as access to the dining halls, libraries, and campus recreational and residential facilities.

106. Mr. Kozler's trespass ban eventually expired on May 21, 2025.

107. ***Plaintiff Alice Elliott.*** Ms. Elliott attended the Festifall Protest on August 28, 2024. She played no role in organizing or leading the protest; instead, she decided to attend the protest after seeing it advertised to the general public on social media, and because she was already going to be on campus to use an on-campus library to which she had access as an alumna.

108.   As she had done at prior protests, Ms. Elliott was prepared to offer her services as a medic in case there was a health-related emergency at the Festifall Protest. During the brief period she was at the protest, she spoke to friends in the audience and held a sign provided by protest organizers.

109.   She also briefly participated in the "die in," lying on the ground as an act of protest and in an artistic expression of speech. While she was on the ground, UMPD officers arrived and appeared to order some participants to stand up and disperse. Ms. Elliott remained on the ground and waited for a UMPD officer to tell protestors in her area to disperse. After seeing protestors near her beginning to disperse, she understood that a dispersal order was likely given, so she stood up and began to leave the Festifall Protest.

110.   As Ms. Elliott was leaving the protest, she saw a group of UMPD officers grab a student and slam them to the ground. Intending to offer her services as a medic, she attempted to approach the student who was being detained. As she got close, but before she reached them, two or three UMPD officers grabbed her and pulled her down to the ground. Those officers handcuffed her and escorted her to a nearby police van.

111.   At the van, a UMPD officer read her *Miranda* rights and searched her belongings. Thereafter, she was transported to the DPSS station along with three other individuals who were arrested at the protest.

34

112.   At the DPSS station, UMPD officers took Ms. Elliott's photograph and fingerprints. After booking Ms. Elliott, a UMPD officer returned her belongings and informed her that she was being released from UMPD custody.

113.   Upon Ms. Elliott's release, UMPD Officer Allen handed her a filled-out trespass form. *See* Elliott Trespass Form, attached hereto as Exhibit H. The form stated that she was being issued a trespass ban because she "[c]ommitted, or [was] suspected of committing, a crime while on campus against persons or property," and that she "[d]isrupted the operations and lawful functions of the University." *Id.* The form further stated that she was banned from "[a]ny land and any building owned or leased by the University of Michigan . . . Ann Arbor Campus." *Id.* The ban was effective immediately, lasting for a period of one year (i.e., until August 28, 2025).

114.   Because of the trespass ban, Ms. Elliott was immediately prohibited from stepping foot on the University's Ann Arbor campus, including to enter University buildings to which she had alumni access, such as the library she frequently visited, and to attend protests or any other event or gathering on campus. She was also impeded from visiting her father, who works on campus.

115.   The trespass ban has also posed an impediment to her employment obligations as an EMT. The emergency nature of EMT work occasionally requires her to transport patients to the University's medical center for urgent treatment. For example, the medical center is one of only two burn centers in the area, so some burn

victims must be taken to the medical center due to the urgent and severe nature of their healthcare needs.

116.    While her ban was in place, Ms. Elliott was banned from the University of Michigan's Ann Arbor campus for *any* reason, including attending protests and other events or workshops that are important for her personal and professional growth, fulfilling her employment obligations, and visiting friends and family on campus.

117.    Ms. Elliott's trespass ban eventually expired on August 28, 2025.

118.    ***Plaintiff Christian Grant.*** On September 24, 2024, Mr. Grant attended a rally opposing the Israeli military's invasion of southern Lebanon. He was asked by organizers to be a protest marshal for the rally, which he agreed to do.

119.    The rally consisted of 30-50 people marching through campus, starting and ending at Angell Hall, an on-campus academic building. As a marshal, Mr. Grant stayed along the edges of the march, watching for cars to ensure that protestors remained safe. The rally ended without incident: there was no physical interaction or altercation between police officers and protestors, and no protestor was arrested or detained.

120.    After the rally ended, Mr. Grant and a few fellow protestors went to his car to leave. Once Mr. Grant started driving, he noticed that two police cars were following him. Soon, shortly after driving through a yellow light, the police cars

pulled him over. Three UMPD officers surrounded his vehicle and falsely accused Mr. Grant of running a red light. Mr. Grant complied with their identification requests and provided the officers with his license and registration. While Mr. Grant was waiting for the officers to return, a different officer who Mr. Grant recognized as being frequently present during protests (Officer Cavanaugh) approached the vehicle and handed Mr. Grant a filled-out trespass form. Eventually, the other officers returned and issued Mr. Grant a ticket for running a red light and a warning for not providing proof of insurance.

121. The trespass form issued to Mr. Grant stated that he was being issued a trespass ban because he "[c]ommitted, or [was] suspected of committing, a crime while on campus against persons or property." *See* Grant Trespass Form, attached hereto as Exhibit I. The form further stated that he was banned from the "Ann Arbor Campus." *Id.* The ban was effective immediately, lasting for a period of one year (i.e., until September 24, 2025).

122. Because of the trespass ban, Mr. Grant was prohibited from attending protests, community meetings, and any other event or gathering on the University's Ann Arbor campus. He was also barred from picking up DoorDash orders from on-campus restaurants, dropping off DoorDash orders to on-campus residents, or traversing through any part of campus while working as a DoorDash driver. As a result, he has had to limit his DoorDash activities to Ypsilanti, as it is not possible

for him to do his job in Ann Arbor under such restrictions. This has resulted in a significant loss in earnings for Mr. Grant.

123. Mr. Grant timely filed an objection to his trespass ban on October 8, 2024.

124. The filing of the objection triggered a so-called formal hearing, which was held in person on October 25, 2024. The hearing included Mr. Grant, his attorney, and Defendant James. At the hearing, Mr. Grant's attorney requested any evidence or reasoning that supported the imposition of the trespass ban. Defendant James refused, stating that it "was not the purpose of this hearing."

125. Instead, Defendant James explained that the purpose of the hearing was for Mr. Grant to explain the incident that led to the trespass ban from his perspective. Defendant James suggested that Mr. Grant may be under criminal investigation, but no evidence was provided and no charges had been filed against Mr. Grant. Still not fully understanding the basis of the trespass ban, Mr. Grant declined to attempt an explanation. Defendant James ended the hearing.

126. On November 6, 2024, Defendant James emailed Mr. Grant a letter informing him that she was rejecting his request and upholding his ban in full. She did not provide any reasoning for, or evidence supporting, her decision. Grant Objection Denial Letter, attached hereto as Exhibit J.

127. Mr. Grant timely appealed Defendant James's decision, and an appeal hearing was held on January 6, 2025 before a commanding officer designated by former DPSS Executive Director Washington. Beyond again alluding to the fact that Mr. Grant may currently be under criminal investigation, the officer did not provide any evidence to support his ban, and Mr. Grant has still not been charged with any crime.

128. During the hearing, Mr. Grant explained to the presiding officer that his trespass ban is significantly impeding his ability to earn a living as a DoorDash driver. He also explained that, given how integrated the University campus is with the greater Ann Arbor area, he is not sure exactly which parts of the local community he can and cannot visit. The presiding officer acknowledged Mr. Grant's comments and ended the hearing.

129. On January 28, 2025, Mr. Grant received a letter from DPSS Executive Senior Director (and now Interim Executive Director and Defendant) Richard Arnold informing him that his appeal was being denied and that his trespass ban was being upheld in full. The letter did not include any explanation or justification for upholding the ban in full. Grant Appeal Decision Letter, attached hereto as Exhibit K.

130. Mr. Grant's trespass ban eventually expired on September 24, 2025.

131. On October 22, 2025, Mr. Grant returned to campus for the first time. He joined several dozen community members and students in a protest opposing former Israeli military members who were on campus for an event.

132. Mr. Grant and the other protestors stood outside the Rackham Auditorium and chanted to express their disagreement with inviting Israeli military members to campus, their discontent with Israeli military action that has led to a humanitarian crisis in Gaza,  and their support of Palestinian human rights.  They did not enter the building or otherwise disrupt the event.

133. Despite simply standing and chanting on a sidewalk outside of the Rackham Auditorium Building with a group of other protesters, and despite not blocking any building entrances, UMPD officers pushed Mr. Grant and two other protesters, arrested them, and placed them in police custody for several hours.

134. Mr. Grant was not charged with any crime or civil infraction while in police custody, and has not since been charged with any crime or civil infraction relating to his conduct at this protest.

135. While he was in police custody, UMPD officer Humphrey handed Mr. Grant a trespass form with very little information on it. *See* Grant Second Trespass Form, attached hereto as Exhibit L.

136. The trespass form issued to Mr. Grant stated that he was being issued a trespass ban because he "[c]ommitted, or [was] suspected of committing, a crime

while on campus against persons or property." *Id.* The form further stated that he was banned from the "Ann Arbor Campus," the "Flint Campus," and the "Dearborn Campus." *Id.* The ban was effective immediately, lasting for a period of one year. However, no date was included on the ban, making it unclear when it expires.

137. In fact, the issuing officer left most of the trespass form blank, omitting pertinent information such as: the date and time the ban was issued, the full name and department of the officer who issued the ban, Mr. Grant's driver's license or ID number, his address, his phone number, and his email address.

138. The trespass form defines the scope of the ban as the "Univrsity [sic] of Michigan," but does not check the box on the form that denotes that the ban covers "any land and any building owned or leased by the University of Michigan." Thus, it remains unclear what the exact scope of the ban is.

139. As of this filing, Mr. Grant still appears to be banned from the University of Michigan's Ann Arbor, Dearborn, and Flint campuses for *any* reason, including attending public protests, meetings, and other events, fulfilling his DoorDash delivery obligations, and visiting friends and acquaintances on campus.

140. Mr. Grant decided not to appeal this trespass ban because, based on his experiences appealing his previous trespass ban, he believes the appeal process is fundamentally unfair and biased, as it lacks basic due process protections and seems

41

to achieve a predetermined outcome of barring him from University and stopping him from attending protests and other events on campus.

141. If Mr. Grant's trespass ban were lifted, he would participate in a number of First Amendment protected activities, including non-violent protests and participation in meetings to which he has been invited by student groups (as he attempted to do on October 22, 2025). He would also enjoy the open spaces on campus and resume working as a DoorDash delivery driver in Ann Arbor.

142. ***Plaintiff Emily Wall***. Mx. Wall participated in a demonstration on May 29, 2025, opposing the University's partnership with Los Alamos National Laboratory to build a water- and energy-intensive artificial intelligence data center focused on surveillance and national security in Ypsilanti Township, Michigan.

143. Mx. Wall attended a talk featuring University Professor Alex Gorodetsky, who is involved with the University's partnership with Los Alamos National Laboratory. The talk was a part of a conference organized by the University's Michigan Institute for Computational Discovery and Engineer. Mx. Wall apparently chanted "UM out of Ypsi," "stop the data center" and "Alex quit your job" for just a few moments before they were escorted out of the presentation by event security.

144. Event security detained Mx. Wall and contacted DPSS.

42

145. DPSS officers were not present during the demonstration, nor did they personally observe the demonstration.

146. DPSS officers arrived on the scene and issued a multi-campus trespass ban to Mx. Wall.

147. The trespass form issued to Mx. Wall stated that they were being issued a trespass ban because they "disrupted the operations and lawful functions of the University." *See* Wall Trespass Form, attached hereto as Exhibit M. The form further stated that they were banned from the "Ann Arbor, Flint, and Dearborn Campuses." *Id.* The ban was effective immediately, lasting for a period of one year (i.e., until May 29, 2026).

148. Mx. Wall timely filed an objection to their trespass ban on June 4, 2025.

149. Mx. Wall received an email from UMPD that stated "Thank you for your recent inquiry regarding your trespass warning. At this time, we are unable to schedule an appeal appointment until your case has been reviewed by the prosecutor's office. Once the case has been resolved, you may request a Trespass Formal Hearing by completing the Trespass Formal Hearing Form, available on the Division of Public Safety and Security website."

150. On June 25, 2025, Mx. Wall was ticketed with a civil infraction for the alleged violation of a University Regents Ordinance, for which they paid a $105 fine at an October 30, 2025, hearing. It remains unclear whether payment of this fine

"resolved" the "case" that was prohibiting Mx. Wall from appealing their trespass ban.

151.   Mx. Wall is banned from the University of Michigan's Ann Arbor, Flint, and Dearborn campuses for *any* reason, including attending public protests, meetings, and other events, and visiting friends and acquaintances on campus.

152.   If Mx. Wall's trespass ban was lifted, they would participate in a number of First Amendment-protected activities, including non-violent protests. They would also enjoy the open spaces on campus.  In particular, Mx. Wall has participated in peacefully posting or distributing fliers opposing the data center around the University campus—an activity now barred by their trespass ban.

153.

**The University's Anti-Disruption Policy**

154.   The trespass bans are not the only method Defendants are utilizing to stifle speech and protest on campus.

155.   On July 1, 2024, the University adopted a new policy governing the use of University facilities and property (hereinafter the "Anti-Disruption Policy"). *See* SPG 601.41, *available at* https://spg.umich.edu/policy/601.41.

156.   The Anti-Disruption Policy states that "the University [of Michigan] has the exclusive authority to determine how its FACILITIES may be used, under what circumstances, and by whom." SPG 601.41 § II.A.1. It defines "FACILITIES"

as "a broad range of spaces, grounds, paths, buildings, structures, rooms, halls, walls, doors, windows, and the like," *id.* § III.A., and generally limits their use to "members of the University community and invited guests," *id.* § II.A., with some facilities being made "available to members of the general public," *id.*

157. The Anti-Disruption Policy imposes limits on the proper use of University "facilities." Namely,

> [i]ndividuals or groups using or present in FACILITIES may not: 1. violate the law or University PROTOCOLS; *2. disrupt University activities or operations or disrupt the lawful, authorized activities of others*; 3. obstruct human or vehicle traffic, ways of ingress and egress, paths, stairs, aisles, and the like; 4. fail to cooperate with Division of Public Safety and Security officers or other officials authorized by the University to act on behalf of the University; or 5. use FACILITIES in a way that the University has not made available for that purpose.

*Id.* § III.A. (emphasis added).

158. Many individuals and groups within the University community widely criticized the Anti-Disruption Policy, which was adopted without prior notice over the summer, as an attack on community members' ability to freely speak and protest—particularly because of its vague and broad ban on "disrupt[ions]" virtually anywhere on campus, at any time, and without limitation or definition as to what constitutes such a disruption.

159. The University of Michigan Faculty Senate's Advisory Committee on University Affairs ("SACUA"), for example, released a statement criticizing the Anti-Disruption Policy and related policy changes as "a hazard to the freedom and

45

openness that is foundational to any democratic institution, which is especially essential to the working of a public university."[14]

160. SACUA's discontent with the Anti-Disruption Policy ultimately formed one of the multiple bases for the Faculty Senate's censure of the University's Board of Regents in November 2024.[15]

161. As the SACUA statement also pointed out, the Anti-Disruption Policy quietly incorporated broad restrictions on disruptive activity that the University had proposed months prior in a different form (then dubbed the "Disruptive Activity Policy").[16] That prior policy proposal, which also broadly banned people from "disrupt[ing] the University Operations of UM Facilities," was met with a similarly massive wave of disapproval from community members and advocacy organizations, such as the American Civil Liberties Union of Michigan.[17]

---

[14] Senate Advisory Committee on University Affairs, *SACUA Letter Regarding Student Statement Changes*, Aug. 20, 2024, https://facultysenate.umich.edu/sacua-letter-regarding-student-statement-changes.

[15] University of Michigan Faculty Senate, *Motion 3: Motion to Censure the University of Michigan Regents*, https://drive.google.com/file/d/11HOea-VR8W0Q4ddqFlFwki7kSUL8U20F/view.

[16] *Id.*

[17] Sneha Dhandapani and Eilene Koo, *Umich Campus Reacts to Draft of Disruptive Action Policy*, The Michigan Daily, Apr. 16, 2024, https://www.michigandaily.com/news/administration/umich-campus-reacts-to-draft-of-disruptive-action-policy/; Anna Jerolimov, *ACLU of Michigan Expresses Concern Over Proposed 'Disruptive Action Policy'*, The Michigan Daily, Apr. 3, 2024, https://www.michigandaily.com/news/news-briefs/aclu-of-michigan-expresses-concern-over-proposed-disruptive-action-policy.

162. In response to that wave of backlash, the University ultimately announced that it was abandoning its effort to adopt the prior policy.[18] Yet, less than three months later—and during the summer when most University community members were away and unable to mobilize to protest—many of the same restrictions were adopted via the Anti-Disruption Policy without significant prior notice or public engagement, this time under the guise of regulating on-campus "facilities."

163. Under the University's Trespass Policy, one of the four bases for issuing a trespass ban is that someone "[d]isrupted lawful operations and functions of the University." Trespass Policy § 4.A. Therefore, any alleged or suspected violations of the Anti-Disruption Policy can form the basis for a University police officer issuing a trespass ban.

164. Indeed, the trespass bans issued to Plaintiffs Kozler, Elliott, and Wall claim that they "disrupted the operations and lawful functions of the University."

165. In addition, the University maintains various disciplinary processes, such as those available through the Office of Student Conflict Resolution ("OSCR"), that incorporate violations of other published University policies. Therefore, alleged

---

[18] *U-M Highlights Updated Policies as New School Year Begins*, The University Record, Aug. 26, 2024, https://record.umich.edu/articles/u-m-highlights-updated-policies-as-new-school-year-begins/ ("was not enacted and will not move forward").

47

violations of the Anti-Disruption Policy can also be used as a basis for initiating disciplinary proceedings against students and student organizations.

166. Consequently, even after Plaintiffs' existing trespass bans are lifted, Plaintiffs risk being subject to new trespass bans or other disciplinary action for violating the Anti-Disruption Policy by engaging in peaceful and lawful protest activities that the University may vaguely allege are "disruptive."

## CLAIMS FOR RELIEF

## COUNT I

**Unconstitutional Restraint on Speech**
**In Violation of the First Amendment and 42 U.S.C. § 1983**
**(Trespass Bans)**

167. Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

168. Because of their full-campus trespass bans, Plaintiffs have had to—and will continue to have to—forgo opportunities to attend and participate in on-campus protests and other activities involving protected speech, such as meeting and associating with student groups engaged in organizing protests.

169. By banning Plaintiffs from campus for one year, thus preventing them from attending on-campus protests and other expressive gatherings, Defendants are unconstitutionally burdening their First Amendment right to speak and protest on campus.

170. In cases involving bans on conduct that burden speech, strict scrutiny applies when, as here, the bans "restrict the 'inputs' that speakers use to express a message," including by "target[ing] certain speakers." *Lichtenstein v. Hargett*, 83 F.4th 575, 597 (6th Cir. 2023).

171. By removing Plaintiffs from the crowd of protestors via the trespass bans, Defendants are restricting speech inputs—i.e., they are ensuring that "fewer voices could convey their message," *id.* at 587 (cleaned up)—thus triggering strict scrutiny.

172. Even if strict scrutiny doesn't apply, courts nonetheless apply a stringent level of scrutiny to individualized bans on conduct that burden speech: the bans must "burden no more speech than necessary to serve a significant government interest." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

173. By issuing Plaintiffs one-year full-campus trespass bans with little-to-no meaningful exemptions, even if they were in response to alleged conduct that was not protected by the First Amendment, Defendants are failing to narrowly tailor the bans to serve any compelling government interest. At the very least, Defendants are not tailoring the bans such that they burden no more speech than necessary to achieve a significant government interest.

174. Defendants are thus violating Plaintiffs' First Amendment rights by banning them from the entire University of Michigan Ann Arbor campus, and as to

Plaintiffs Zou, Kozler, Grant, and Wall, from the Flint and Dearborn campuses as well. U.S. Const. amend. I.

## COUNT II

### Deprivation of Substantive Due Process Rights
### In Violation of the Fourteenth Amendment and 42 U.S.C. § 1983
### (Trespass Bans)

175.  Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

176.  Substantive due process protects Plaintiffs' fundamental rights to "travel locally through public spaces and roadways," *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002), and to "remain in a public place of [their] choice," *Kennedy v. City of Cincinnati*, 595 F.3d 327, 336 (6th Cir. 2010).

177.  By banning Plaintiffs from the entire University of Michigan Ann Arbor campus (and as to Plaintiffs Zou, Kozler, Grant, and Wall) from the Flint and Dearborn campuses as well) for one year, Defendants are violating Plaintiffs' fundamental rights to freely navigate and remain on public parts of campus, such as sidewalks, roadways, and parks.

178.  Deprivations of fundamental rights protected by substantive due process are subject to strict scrutiny. *Bambach v. Moegle*, 92 F.4th 615, 624 (6th Cir. 2024).

179.    By issuing Plaintiffs one-year full-campus trespass bans with little-to-no meaningful exemptions, Defendants are failing to narrowly tailor the bans to serve any compelling government interest.

180.    Defendants are thus violating Plaintiffs' Fourteenth Amendment rights to freely navigate and remain on public parts of campus by banning them from the entire University of Michigan Ann Arbor campus, and as to Plaintiffs Zou, Kozler, Grant, and Wall, from the Flint and Dearborn campuses as well. U.S. Const. amend. XIV, § 1.

### COUNT III

**Deprivation of Procedural Due Process Rights (No Pre-Deprivation Hearing)**
**In Violation of the Fourteenth Amendment and 42 U.S.C. § 1983**
**(Trespass Bans)**

181.    Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

182.    By issuing the trespass bans without a prior hearing, Defendants deprived all Plaintiffs of their liberty interests in navigating and remaining on campus without adequate process, as described in Count II, as well as their liberty interest in freely exercising their First Amendment rights, as described in Count I.[19]

---

[19] Defendants' actions had also deprived Plaintiffs Zou and Kozler of a protected property interest in continuing to attend classes for which they enrolled and paid tuition. However, since their bans were updated to allow them to attend class, this property interest is no longer currently being deprived.

51

183.   A pre-deprivation hearing is "'the root requirement' of the Due Process Clause." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). Only when facing an emergency or when a pre-deprivation hearing is impracticable can Defendants depart from this requirement.

184.   Plaintiffs were each issued a trespass ban after their allegedly violative conduct had ceased—i.e., after any cognizable emergency had ended.

185.   None of the conduct Defendants alleged that any Plaintiff engaged in would constitute an emergency sufficient to justify depriving Plaintiffs of their liberty without a hearing in any event.

186.   Given that the trespass bans were issued pursuant to established policy and using a template form, and given the ease with which a post-deprivation hearing was arranged, a prompt pre-deprivation hearing was certainly practicable, predictable, and not fiscally burdensome.

187.   Defendants thus violated Plaintiffs' procedural due process rights by imposing the trespass bans without first offering them a hearing to contest the basis of the ban. U.S. Const. amend. XIV, § 1.

## COUNT IV

### Deprivation of Procedural Due Process Rights (Inadequate Hearing)
### In Violation of the Fourteenth Amendment and 42 U.S.C. § 1983
### (Trespass Bans)

188.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

189.   Procedural due process guarantees Plaintiffs sufficient notice of the allegations being made against them, and an opportunity to respond to those allegations in a fair and impartial tribunal.

190.   In the appeal hearings that some Plaintiffs pursued, Defendants never offered sufficient explanations for, or *any* evidence supporting, their imposition of Plaintiffs' trespass bans. Plaintiffs were left to guess why they were banned from campus and somehow defend themselves against those possible explanations. Essentially, Plaintiffs were told that the only way for them to contest the bans was to confess to potentially criminal conduct or otherwise self-incriminate themselves, without even being able to confront the evidence against them. Plaintiffs were not sufficiently notified of the allegations against them, rendering them unable to meaningfully respond and defend themselves.

191.   The appeal hearings were also conducted by other police officers. The appellate decision-makers were merely the supervisors of the officers who issued the ban, thus rendering them unduly partial to upholding the bans. Those decision-

makers presumably spoke with the police officers who issued the bans on an *ex parte* basis, but did not make those officers available to Plaintiffs or their attorneys for any kind of cross examination or other information-gathering process.

192.   And as to Plaintiff Wall, Defendants have outright refused to even provide a hearing until the county prosecutor's office completes its supposed review of Mx. Wall's alleged misconduct—an investigative process that has no standard timeline or deadline.

193.   Defendants thus violated Plaintiffs' procedural due process rights by failing to provide sufficient notice and a fair and impartial appeal process. U.S. Const. amend. XIV, § 1.

## COUNT V

### Facially Vague and Overbroad Policy
### In Violation of the First and Fourteenth Amendments and 42 U.S.C. § 1983
### (Anti-Disruption Policy)

194.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

195.   Plaintiffs are all subject to the Anti-Disruption Policy because they are "members of the University community" or their "invited guests," as least as to their attendance at on-campus protests. SPG 601.41 § II.A.

196.   Plaintiffs are also all subject to the Anti-Disruption Policy because it can constitute the basis for issuing a trespass ban.

197. The Anti-Disruption Policy prohibits Plaintiffs from "disrupt[ing] University activities or operations or disrupt[ing] the lawful, authorized activities of others." SPG 601.41 § III.A.

198. The Anti-Disruption Policy fails to specify which kinds of on-campus disruptions would violate the policy (for example, whether brief, minor disruptions to university operations would violate the policy).

199. Plaintiffs, other members of the public, and University officers and officials are left to guess whether, for example, the simple use of posters and banners, a simple march down a public sidewalk, or making a brief statement at a protest would violate the Anti-Disruption Policy.

200. Insofar as the Anti-Disruption Policy prohibits expressive activities that do not materially and substantially interfere with school operations, it violates the First Amendment.

201. Because of their fear of an unanticipated violation of the Anti-Disruption Policy, Plaintiffs will be deterred from attending on-campus protests in which their mere attendance and participation could trigger legal consequences—including new trespass bans—even if their existing ban expires, is lifted, or is enjoined.

202. The Anti-Disruption Policy is thus vague and overbroad in violation of the First and Fourteenth Amendments because the policy is not specific enough for

55

a reasonable person to understand what speech is and is not prohibited and because it impairs the expression of constitutionally protected speech.

## COUNT VI

**Vague and Overbroad Policy—Facially and As Applied**
**In Violation of the First and Fourteenth Amendments and 42 U.S.C. § 1983**
**(Trespass Policy)**

203.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

204.   When on University property, Plaintiffs are all subject to the Trespass Policy, which applies generally to "individuals… on property owned or leased by the university." Trespass Policy § 1.

205.   The Trespass Policy authorizes UMPD officers to issue a trespass ban if they believe an individual "[d]isrupted lawful operations and functions of the University…." Trespass Policy § 4.A.(3).

206.   Plaintiffs Kozler, Elliott, and Wall, were all issued a trespass ban on this basis, among others.

207.   Like the Anti-Disruption Policy, the Trespass Policy fails to specify which kinds of on-campus disruptions would violate the policy and subject someone to a trespass ban (for example, whether brief, minor disruptions to university operations would violate the policy).

208.   Plaintiffs, other members of the public, and University officers and officials are left to guess whether, for example, the simple use of posters and banners, a simple march down a public sidewalk, or making a brief statement at a protest would violate § 4.A.(3) of the Trespass Policy.

209.   Insofar as the Trespass Policy prohibits expressive activities that do not materially and substantially interfere with school operations, it violates the First Amendment.

210.   Because of their fear of an unanticipated violation of § 4.A.(3) of the Trespass Policy, Plaintiffs will be deterred from attending on-campus protests in which their mere attendance and participation could trigger legal consequences—namely new trespass bans—even if their existing ban expires, is lifted, or is enjoined.

211.   Trespass Policy § 4.A.(3) is thus vague and overbroad in violation of the First and Fourteenth Amendments because the policy is not specific enough for a reasonable person to understand what speech is and is not prohibited and because it impairs the expression of constitutionally protected speech.

212.   The Trespass Policy § 4.A.(3) is also vague and overbroad in violation of the First and Fourteenth Amendments as applied to Plaintiffs.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs ask the Court to:

213. Enter judgment in favor of Plaintiffs and against Defendants;

214. Enter a declaratory judgment that Defendants' Trespass Policy and trespass bans, as applied to Plaintiffs, violate the First Amendment right to freedom of speech and assembly, the Fourteenth Amendment right to substantive due process, and the Fourteenth Amendment right to procedural due process;

215. Declare that the Anti-Disruption Policy is facially vague and overbroad in violation of the First and Fourteenth Amendments;

216. Declare that § 4.A.(3) of the Trespass Policy is facially vague and overbroad in violation of the First and Fourteenth Amendments, and also that it is vague and overbroad as applied to Plaintiffs;

217. Issue an injunction prohibiting Defendants from enforcing, or authorizing any DPSS or UMPD officers, employees, or agents to enforce, the trespass bans issued to Plaintiffs;

218. Issue an injunction prohibiting Defendants from issuing, or authorizing any DPSS or UPMD officers, employees, or agents to issue, any future trespass bans that cover the entire campus or significant portions of it unless (1) they are issued in response to conduct that poses a convincing, demonstrable, and significant threat of imminent and recurrent physical harm if a ban is not imposed; and (2) Defendants provide the accused with a hearing *before* the trespass ban goes into effect at which all evidence and allegations supporting the ban must be provided to the accused and the determination of whether the ban should be implemented is made by a neutral

58

adjudicator who has not communicated with the accusing police officers on an *ex parte* basis in advance;

219. Issue an injunction prohibiting Defendants from enforcing, or authorizing any University of Michigan employee or agent to enforce, the Anti-Disruption Policy's prohibition on "disrupt[ing]" University facilities;

220. Issue an injunction prohibiting Defendants from issuing, or authorizing any University of Michigan employee or agent to issue, trespass bans on the basis of § 4.A.(3) of the Trespass Policy;

221. Award Plaintiffs attorney fees and other litigation costs and expenses pursuant to 42 U.S.C. § 1988 and any other applicable law; and

222. Grant such other relief the Court may deem just and proper.

Respectfully submitted,

/s/ Ramis J. Wadood
Ramis J. Wadood (P85791)
Philip E. Mayor (P81691)
Syeda Davidson (P72801)
Marc Allen (P82312)
Bonsitu Kitaba-Gaviglio (P78822)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6800
rwadood@aclumich.org

Jack W. Schulz (P78078)
Cooperating Attorney,
American Civil Liberties Union
  Fund of Michigan
645 Griswold St. Suite 4100
Detroit, MI 48226
(313) 788-7446
jack@michiganworkerlaw.com

Amanda M. Ghannam (P83065)
Cooperating Attorney,
American Civil Liberties Union

John C. Philo (P52721)
Liz Jacob (P86981)
Anthony D. Paris (P71525)
SUGAR LAW CENTER
FOR ECONOMIC & SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, MI 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
ljacob@sugarlaw.org
tparis@sugarlaw.org

Fund of Michigan
3200 Greenfield Rd., Ste. 300
(313) 315-5327
amanda@amglegalcounsel.com

Attorneys for Plaintiffs

Dated: May 19, 2026

**LOCAL RULE CERTIFICATION**

I, Ramis J. Wadood, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

/s/ Ramis J. Wadood (P85791)